[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 28, 2011
JOHN LEY
CLERK

No. 09-11687

———————

D. C. Docket No. 06-80199-CR-KAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TIMOTHY WETHERALD,
MARC SHINER,
LEON SWICHKOW,

Defendants-Appellants.

———————

Appeals from the United States District Court
for the Southern District of Florida

———————

(March 28, 2011)

Before DUBINA, Chief Judge, BLACK, Circuit Judge, and GOLDBERG,* Judge.

———————

*Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

DUBINA, Chief Judge:

Appellants Timothy Wetherald, Marc Shiner, and Leon Swichkow (collectively "Appellants") appeal their convictions and sentences resulting from a thirty-one count indictment for their involvement in a scheme—running from approximately 2000 to 2003—to defraud investors in telecommunication companies, known as competitive local exchange carriers ("CLECs"), operated by Appellants. Counts 1–3, 7–8, and 10–18 charged Shiner and Swichkow with wire fraud in violation of 18 U.S.C. § 1343. Counts 4–6 and 9 charged Wetherald with wire fraud. Counts 19–22 charged Shiner and Swichkow with mail fraud in violation of 18 U.S.C. § 1341. Count 23 charged all three men with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff. Finally, counts 24–31 charged Shiner and Swichkow with money laundering in violation of 18 U.S.C. § 1957. A jury found Appellants guilty on all counts.

Appellants appeal their convictions on a number of grounds. Appellants argue the district court should have dismissed the case for pre-indictment delay, the evidence was insufficient to support their convictions, the securities fraud statute is unconstitutional, the district court's trial rulings resulted in reversible error, application of the Sentencing Guidelines in effect at the time of sentencing violated the Ex Post Facto Clause of the U.S. Constitution, and the district court

2

imposed unreasonable sentences.  With the benefit of the parties' briefs and oral argument, we find no merit in the bulk of Appellants' contentions.  But Appellants' argument that the district court violated the Ex Post Facto Clause by applying a different Guideline range than that in effect at the time of the offense raises questions that this court has not squarely addressed in the wake of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005).  Because the use of the Sentencing Guidelines in effect at the time of sentencing did not raise a substantial risk of a harsher punishment for the Appellants, we conclude that the district court's failure to apply the Guidelines in effect at the time of the offense did not violate the Ex Post Facto Clause.

## I.

Appellants' convictions stem from a scheme by the three men to create and sell partnerships in CLECs operating in Colorado, Arizona, Washington, Minnesota, Oregon, and one serving both Iowa and Nebraska.  The underlying business model—buying wholesale telecommunications services for resale—was not itself unsound.  Due to an effort to prevent the monopolization of local telephone service by national outfits, Congress enacted the Federal Telecommunications Act of 1996.  As a part of this legislation, the so-called

"Regional" or "Baby Bells" that dominated the telecommunications industry at the time are required to offer local retail telecommunications services for resale at a wholesale discount to any CLECs that possess the proper state licenses. These CLECs are then able to offer communications services without any infrastructure of their own. Thus, the business of the CLECs consists only of acquiring customers and reselling to those customers at a retail price services purchased from the Regional Bell at a wholesale cost.

In 2000, Wetherald created ON Systems, a company intended to establish and manage CLECs. His plan was to purchase services from Qwest, a large western telecommunications company, and then resell those services around the western United States. After Wetherald had difficulty finding investors for his venture, he met with Shiner who, with Swichkow, ran a telemarketing company known as Telecom Advisory Services ("Telecom"). Working together, ON Systems and Telecom eventually gathered 250 investors for six limited-liability partnerships: Mile High Telecom Partners, LLP in Colorado ("Mile High"); The Phone Company of Arizona, LLP; The Washington Phone Company, LLP; The Minnesota Phone Company Financial Group, LLP; The Iowa/Nebraska Phone Company, LLP; and The Oregon Phone Company Financial Group, LLP.

4

A Securities and Exchange Commission investigation later revealed that these investors were enticed by misleading and in some cases patently false claims made by Appellants. They also were not informed that Shriner was a convicted felon who had been a defendant in previous regulatory actions or that Wetherald, in addition to steering several telecommunications companies into bankruptcy, was the subject of a permanent injunction in Washington and Oregon regarding his actions in the telecommunications industry in those states. By the time the Securities and Exchange Commission stepped in—filing an enforcement action against Appellants that later became the basis of this criminal action—the CLECs had collapsed, losing investors in excess of $8 million.

At sentencing, the district judge sentenced Appellants according to the 2008 U.S. Sentencing Guidelines rather than the 2002 Guidelines in effect at the time the Appellants committed the offenses. Departing downward for each Appellant, the court sentenced Wetherald to 144 months, Shiner to 168 months, and Swichkow to 108 months. Appellants filed timely notices of appeal and are presently incarcerated.

## II.

Preserved constitutional challenges to the district court's application of the sentencing guidelines are reviewed *de novo*. *United States v. Paz*, 405 F.3d 946,

5

948 (11th Cir. 2005). This court reviews a district court's denial of a motion to dismiss an indictment for abuse of discretion, but will review the court's choice of legal standard *de novo*. *United States v. Robison*, 505 F.3d 1208, 1225 n.24 (11th Cir. 2007). Sufficiency of the evidence is reviewed *de novo* in the light most favorable to the government to determine whether any rational trier of fact could have reached a verdict of guilty. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2789–90 (1979). Evidentiary rulings are reviewed for abuse of discretion. *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005). When a party claims evidentiary error for the first time on appeal, the court applies a plain error standard of review. *Id.* If the cumulative effect of evidentiary errors is prejudicial, the court will reverse, even if each individual error is harmless. *Id.* at 1203. We review sentences for procedural and substantive reasonableness under an abuse of discretion standard. *United States v. Livesay*, 587 F.3d 1274, 1278 (11th Cir. 2009).

### III.

Prior to the Supreme Court's decision in *Booker*, this court had repeatedly held that although the district courts should "presumptively apply the Guidelines as they exist at the time of sentencing, they may not do so where those Guidelines would lead to imposition of a harsher penalty than that to which the defendant was

subject at the time of the offense." *United States v. Simmons*, 368 F.3d 1335, 1338 (11th Cir. 2004). The court based this holding on long-established precedent, citing the 1798 case of *Calder v. Bull*, 3 U.S. 386, 390 (1798), for the proposition that "every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed" is an ex post facto law. *Simmons*, 368 F.3d at 1338.

This court has yet to directly address the ex post facto implications of *Booker* on the Guidelines. In *United States v. Masferrer*, the court, citing our pre-*Booker* decision in *Simmons*, wrote, "However, if a more lenient guidelines sentence was in effect at the time of the offense, the Guidelines Manual applicable at the time of the offense must be applied to avoid an Ex Post Facto Clause violation." 514 F.3d 1158, 1163 (11th Cir. 2008); *see also United States v. Kapordelis*, 569 F.3d 1291, 1314 (11th Cir. 2009) ("Pursuant to the Ex Post Facto Clause, if applying the Guidelines in effect at the time of sentencing would result in a harsher penalty, a defendant must be sentenced under the Guidelines in effect at the time when he committed the offense."). *Masferrer*, however, did not require us to address the ex post facto implications of *Booker*. Nevertheless, while we have not addressed the question as presented in this case, we have affirmed the

7

underlying principles that led to the application of the Ex Post Facto Clause in our pre-*Booker* opinions.

Our sister circuits have split on the impact of *Booker* in regards to the Ex Post Facto Clause. The Seventh Circuit has taken the view that the Ex Post Facto Clause no longer poses a problem, as it applies "only to laws and regulations that bind rather than advise." *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006); *see also United States v. Barton*, 455 F.3d 649, 655 n.4 (6th Cir. 2006) ("Now that the Guidelines are advisory, the Guidelines calculation provides no such guarantee of an increased sentence, which means that the Guidelines are no longer akin to statutes in their authoritativeness. As such, the Ex Post Facto Clause itself is not implicated."). The Seventh Circuit noted that after *Booker* the district judge's sentence, "whether inside or outside the guideline range, is discretionary and subject therefore to only light appellate review." *Demaree*, 459 F.3d at 795. The court further opined that a district judge who wants to apply the sentence suggested in a new Guidelines provision would simply "say that in picking a sentence consistent with section 3553(a) he had used the information embodied in the new guideline." *Id.*

The D.C. Circuit has squarely rejected this position, finding that the application of a harsher Guidelines range in place at sentencing presents a

constitutional problem.  *United States v. Turner*, 548 F.3d 1094, 1099–1100 (D.C. Cir. 2008).  The court declined to adopt the Seventh Circuit's implication that "district judges will misrepresent the true basis for their actions" if not allowed to overtly employ recently implemented Guidelines.  *Id.* at 1099.  The D.C. Circuit then enumerated the ways in which the Guidelines continue to bind, even though they are now advisory.  *Id.* at 1099–1100.  The court concluded the "proper approach is therefore to conduct an 'as applied' constitutional analysis," finding that a party need only show that the district court's failure to employ the Guidelines in effect at the time the offense was committed resulted in "a substantial risk" of a more severe sentence.  *Id.* at 1100; *see also United States v. Ortiz*, 621 F.3d 82, 87 (2d Cir. 2010) ("We think the 'substantial risk' standard adopted by the D.C. Circuit appropriately implements the *Ex Post Facto* Clause in the context of sentencing under the advisory Guidelines regime, and is faithful to Supreme Court jurisprudence explaining that the Clause protects against a post-offense change that 'create[s] a significant risk of increas[ing] [the] punishment.'") (citing *Garner v. Jones*, 529 U.S. 244, 255, 120 S. Ct. 1362, 1370 (2000) (alterations in original)).

Because it is consistent both with our interpretation of Supreme Court precedent and this circuit's jurisprudence, we find the approach taken by the D.C.

9

Circuit more compelling than that of the Seventh Circuit.  It is true that the Guidelines are no longer mandatory, but neither are they without force.  The simple reality of sentencing is that a "sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines." *Rita v. United States*, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007).  As the D.C. Circuit noted, "Practically speaking, applicable Sentencing Guidelines provide a starting point or 'anchor' for judges and are likely to influence the sentences judges impose." *Turner*, 548 F.3d at 1099.  This starting point serves to cabin the potential sentence that may be imposed, and the Supreme Court has recognized that the appeals courts may presume the reasonableness of a sentence that reflects the district court's proper application of the Sentencing Guidelines.  *Rita,* 551 U.S. at 347, 127 S. Ct. at 2462.  We also have acknowledged that "ordinarily we would expect a sentence within the Guidelines range to be reasonable." *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).  Although we have declined to find that a sentence within the Guidelines range is reasonable per se, we have noted that the Guidelines remain "central to the sentencing process" and that "our ordinary expectation still has to be measured against the record, and the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both that record and

10

the factors in section 3553(a)." *Id.* at 787, 788; *United States v. Irey*, 612 F.3d

1160, 1191 (11th Cir. 2010) ("Section 3553(a) plays a critical role in appellate

review of sentences, just as it does in the initial sentencing decision."). And once

a sentencing judge correctly applies the Guidelines range, the defendant's relief is

greatly limited. This court will disturb the finding of the district court "if, but only

if, we 'are left with the definite and firm conviction that the district court

committed a clear error of judgment in weighing the § 3553(a) factors by arriving

at a sentence that lies outside the range of reasonable sentences dictated by the

facts of the case.'" *Irey*, 612 F.3d at 1190 (quoting *United States v. Pugh*, 515 F.3d

1179, 1191 (11th Cir. 2008)).

Thus, the application of the correct Guidelines range is of critical

importance, and it cannot be said that the Ex Post Facto Clause is never implicated

when a more recent, harsher, set of Guidelines is employed.[1] But it is equally

---

[1]While the government attempts to analogize to cases involving the grant of discretionary parole, we do not find sentencing and parole to be perfectly analogous. While several ex post facto cases have revolved around parole procedures, there is a distinction between how the court treats the granting of parole—what amounts to an act of undeserved mercy—and the imposition of criminal sentence. Justice Scalia recognized this aspect of parole, writing, "Any sensible application of the *Ex Post Facto* Clause, and any application faithful to its historical meaning, must draw a distinction between the penalty that a person can anticipate for the commission of a particular crime, and opportunities for mercy or clemency that may go to the reduction of the penalty . . . . In Georgia parole, like pardon (which is granted or denied by the same Board), is—and was at the time respondent committed his offense—a matter of grace." *Garner v. Jones*, 529 U.S. 244, 258, 120 S. Ct. 1362, 1372–73 (2000) (Scalia, J., concurring). Thus, the force of the Ex Post Facto Clause may not be as great when applied to parole as it would be in a sentencing context.

11

clear that we need not "invalidate every sentence imposed after a Guidelines range has been increased after the date of the offense." *Ortiz,* 621 F.3d at 87. Rather, we will look to the sentence as applied to determine whether the change created "'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Garner*, 529 U.S. at 250, 120 S. Ct. at 1367 (quoting *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 509, 115 S. Ct. 1597, 1603 (1995)). This standard is consistent with our precedent. As we said in *Kapordelis*, "While we have held that the district court must correctly calculate the Guidelines before imposing a sentence, we are not required to vacate a sentence if it is likely that, under the correctly calculated Guidelines, the district court would have imposed the same sentence." 569 F.3d at 1314. Therefore, we will only find an Ex Post Facto Clause violation when a district judge's selection of a Guidelines range in effect at the time of sentencing rather than that at the time of the offense results in a substantial risk of harsher punishment. This standard recognizes the ongoing importance of the Sentencing Guidelines while maintaining the district court's broad discretion to consider relevant information in formulating an appropriate sentence.

Although the district court should have applied the more lenient Guidelines sentence in effect at the time of the Appellants' offense, they have failed to show a

substantial risk that the application of the 2008 Guidelines resulted in the imposition of a harsher sentence. In *Kapordelis*, we refused to overturn a sentence based on incorrectly calculated Guidelines because the district court made it clear it would have imposed the same sentence regardless. *Id.* Here the sentencing judge explicitly stated that he was aware of the conflict between the Guidelines and that although he applied the more recent version, he believed the totality of the circumstances called for a significantly lower sentence. He explained,

> So I'm going to agree with the Government that the current guideline manual should be used in this case, because it does not have an ex post facto effect, because the guidelines are discretionary, I'm free to disregard them. And I can tell you right now I'm going to. I'm not going to apply the guideline—I'm not going to impose a 360-month sentence on any of these Defendants, but I think that's the guidelines where we have to start. . . . But, again, I'm giving everybody advance notice that I think those guidelines are—I'm going to deviate from them and vary from them when I do impose sentence.

(R.296 at 52:12–19, 22–25.)

The court also commented specifically on each defendant, stating as to Shriner,

> I don't think it would have made a difference. I think—and, as a matter of fact, if I was operating under the 2002 guidelines versus the 2008 guidelines, I don't think it would have made a difference. I tried to impose the sentence that I thought was appropriate based upon the facts of the case without regard to the guidelines, and I think this is where I—I'm pretty certain this is where I would have come

13

out, regardless of whether I would have had that two-level increase or not.

(R.296 at 245:5–13.)

Turning to Swichkow, the court stated that it would "impose a sentence below the advisory guideline range because the Court believes the sentence it will impose will reflect the seriousness of the offense and provide just punishment." (R.296 at 247:9–11.) The district court made a similar statement regarding Wetherald's sentence, reiterating that it would depart from the Guidelines and impose a sentence that was appropriate. (R.296 at 209:4–210:11.)

The district court is not required to utter a set of magic words in order to come within *Kapordelis*. We find the statements of the district court more than sufficient to show that the improper application of the Guidelines did not create a substantial risk of a harsher sentence. The sentences imposed bolster this position. Under the 2008 Guidelines, all three defendants were subject to a Guidelines range of 210–262 months. The 2002 Guidelines range was significantly lower at 151–188 months for all three defendants. Nevertheless, only Shiner's sentence of 168 months even fell within the 2002 Guidelines range. Wetherald's sentence of 144 months was below the range, and Swichkow's sentence of 108 months represented a significant downward departure, 43 months below the minimum

14

sentence recommended by the 2002 Guidelines. Appellants have presented no evidence that these sentences were affected by the district court's reference to the 2008 Guidelines, and their speculation that the judge might have departed even further had he employed the 2002 Guidelines is not sufficient to show a substantial risk of harsher punishment. Therefore, we conclude that the district court did not violate the Ex Post Facto Clause in sentencing Appellants.

Appellants' other arguments do not merit relief. Turning first to Appellants' claims of pre-indictment delay, we have found that pre-indictment delay may raise due process concerns in certain circumstances. In *United States v. Solomon*, we held, "To establish that a pre-indictment delay violated his due process rights, a defendant must show (1) that he was actually prejudiced by the delay in preparing his defense, and (2) that the delay was unreasonable." 686 F.2d 863, 871 (11th Cir. 1982). We look at unreasonableness in pre-indictment delay cases through the lens of tactical advantage, and the court "has said that the motivations behind the delay must violate 'fundamental conceptions of justice', or a sense of 'fair play' or 'decency'." *Id.* (quoting *United States v. Parker*, 586 F.2d 422, 431 (5th Cir. 1978); *United States v. Shaw*, 555 F.2d 1295, 1299 (5th Cir. 1977)). Applying this standard, the *Solomon* court found, "Even if [the defendant] had made the necessary showing of prejudice . . . he has not demonstrated that the

15

delay was for the purpose of giving the government a tactical advantage." *Id.* at 872. Tactical advantage is the touchstone in pre-indictment delay cases, and in *United States v. Lindstrom* the court explicitly held an appellant must show "(1) that the delay caused actual prejudice to the conduct of his defense, and (2) that the delay was the product of deliberate action by the government designed to gain a tactical advantage." 698 F.2d 1154, 1157 (11th Cir. 1983); *see also United States v. Benson*, 846 F.2d 1338, 1342–43 (11th Cir. 1988) ("Under the standard first used in [*Solomon*] and since used consistently in this circuit, to prevail on a due process claim, the defendant must show that any delay by the government not only caused actual prejudice, but that the prosecution 'deliberately caused the delay to gain any tactical advantage.'") (citation omitted).

There is simply no evidence that the government intentionally delayed this action in an effort to gain a tactical advantage over Appellants. Therefore, Appellants cannot prevail on their due process claim.

Turning to Appellants' argument that the government failed to show an intent to defraud, the evidence shows otherwise. Intent may be found when "the defendant believed that he could deceive the person to whom he made the material misrepresentation out of money or property of some value." *United States v. Maxwell*, 579 F.3d 1282, 1301 (11th Cir. 2009) (internal quotation marks

16

omitted). "A jury may infer an intent to defraud from the defendant's conduct." *Id.* Information is material if it has "'a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed.'" *Id.* at 1299 (quoting *United States v. Hasson*, 333 F.3d 1264, 1271 (11th Cir. 2003) (alteration in the original)).

The information Appellants gave investors was replete with misinformation and key omissions, and investors testified that had they known the correct information, they would never have invested in the CLECs. Shiner and Wetherald neglected to inform the investors of their prior problems with the law or the bankrupted businesses they left behind. Appellants sold non-voting shares they had promised to retain without informing the other investors. Appellants falsely claimed that the existing CLECs were experiencing excellent results in an effort to draw more investors.

While Shiner and Swichkow plead ignorance, the fact that they set up offices in ON Systems' Colorado location and eventually became part owners of ON Systems belies this claim. Furthermore, several witnesses testified to Shiner and Swichkow's knowledge of the licensing problems and billing disputes with Qwest. Witnesses testified to Wetherald's efforts to mislead the Colorado Public Utilities Commission as well as the investors. The evidence repeatedly shows that

17

all Appellants were intimately involved in the scheme and that none of them can claim ignorance. The jury evaluated this evidence, and taking it in the light most favorable to the government, there can be no doubt that the evidence was sufficient to support the jury verdict.[2]

Appellants also attempt to overcome their securities fraud conviction by claiming that the jury improperly determined that the partnership interests were, in fact, securities. Long-standing precedent holds, "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests

---

[2]Appellants challenge their money laundering convictions as well. To the extent Appellants are guilty of mail and wire fraud, however, their challenge to their money laundering convictions also fails. *United States v. Johnson,* 440 F.3d 1286, 1289 (11th Cir. 2006) ("To obtain a conviction on a [18 U.S.C.] § 1957 [money laundering] charge, the government bears the burden of proving beyond a reasonable doubt that [the defendant] 'knowingly engaged or attempted to engage in a monetary transaction in criminally derived property that is of value greater than $ 10,000 and is derived from specified unlawful activity.'"). Appellants contend that the government must also show the transactions were designed to conceal. Concealment, however, is an element of § 1956, not § 1957. *See United States v. Wynn*, 61 F.3d 921, 926–27 (D.C. Cir. 1995) ("[Section 1957] differs from section 1956 in two critical respects: It requires that the property have a value greater than $ 10,000, but it does not require that the defendant know of a design to conceal aspects of the transaction or that anyone have such a design. Due to the omission of a 'design to conceal' element, section 1957 prohibits a wider range of activity than money 'laundering,' as traditionally understood.").

in the physical assets employed in the enterprise." *S.E.C. v. W. J. Howey Co.*, 328

U.S. 293, 298–99, 66 S. Ct. 1100, 1103 (1946). We have held that "solely" is not

"interpreted restrictively." *S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 754

(11th Cir. 2007). Rather, the court looks to the economic reality, focusing "on the

dependency of the investor on the entrepreneurial or managerial skills of a

promoter or other party." *Id.* at 755 (quoting *Gordon v. Terry*, 684 F.2d 736, 741

(11th Cir. 1982)). When reviewing partnerships, the Fifth Circuit set out the

following test:

> A general partnership or joint venture interest can be designated a
> security if the investor can establish, for example, that (1) an
> agreement among the parties leaves so little power in the hands of the
> partner or venturer that the arrangement in fact distributes power as
> would a limited partnership; or (2) the partner or venturer is so
> inexperienced and unknowledgeable in business affairs that he is
> incapable of intelligently exercising his partnership or venture
> powers; or (3) the partner or venturer is so dependent on some unique
> entrepreneurial or managerial ability of the promoter or manager that
> he cannot replace the manager of the enterprise or otherwise exercise
> meaningful partnership or venture powers.

*Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981)[3]; *Merchant Capital, LLC*,

483 F.3d at 755 (citing *Williamson*, 645 F.2d at 424).

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

Appellants argue that the CLECs were partnerships and that the investors exercised substantial control over the enterprise. Thus, they contend, securities law does not apply. The evidence shows otherwise. The partnerships were sold as having the advantage of ON Systems expertise as a managing company, headed by the experienced Wetherald. Investors testified that they had no telecommunications experience or knowledge of how to operate a company, but they were assured that experience was not necessary. Investors testified that once they signed the joint venture agreement, Appellants did not ask them to vote on important decisions. The partnership committees had no power, met over the telephone, and were largely symbolic. Time commitment was minimal. The investors did not control disbursement of funds. Wetherald filed a petition for bankruptcy for Mile High Joint Venture without consulting the investors. A Colorado Public Utility Commission employee testified that Wetherald stated that the investors merely provided funding and had no say in the operations of the company. As the scheme began to fall apart, the investors attempted to gain information, including financial statements of the CLECs, but found themselves powerless to do so. The jury was aware that certain investors had moderately more involvement in the operation of the CLECs than others, and they were also aware that as the fraudulent nature of the scheme was revealed, some investors

20

were able to organize themselves and remove On Systems as the management company for their CLECs.  But the totality of the evidence was more than sufficient to allow the jury to conclude that, indeed, these were securities, not partnership interests.

Shiner and Swichkow claim that 15 U.S.C. § 78j is vague and leads to arbitrary and capricious application of the securities law.  Void-for-vagueness challenges, absent a First Amendment claim, are evaluated as applied to the facts of each case.  *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002).  Statutes must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Id.*  Appellants were indicted for violating 15 U.S.C. § 78j(b), which states that it will be unlawful for any person

> to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Appellants claim it is impossible to determine whether partnership agreements such as the one at issue in this case fall within the security laws.  In reality,

however, this is not a case in which it is impossible or even difficult to classify the partnership interests involved; they fall well within the securities statute. The void-for-vagueness challenge is without merit.

Appellants allege a number of evidentiary errors, claiming that either individually or cumulatively these errors should lead to a reversal of their convictions. These arguments fail. Appellants argue extensively about admission of their prior convictions, regulatory actions, and bankruptcies. As detailed above, however, Appellants asked investors to trust them with their money and the management of these companies. Their past was material to these investors and thus relevant to the government's case, outweighing any prejudicial effect. The district court addressed Appellants' other claims by sustaining objections, striking testimony, and providing curative instructions to the jury. The strength of the government's evidence was sufficient to overcome any errors the Appellants allege the district court made at trial. Thus, we conclude that any error was harmless.

Finally, the sentences imposed upon the Appellants are neither procedurally nor substantively unreasonable. The district courts have broad discretion to impose sentence, and the sentencing judge exercised that discretion, departing downward for Swichkow and Wetherald and sentencing Shiner squarely within the

22

range recommended by the 2002 Guidelines. We find no reason to disturb the well-reasoned judgment of the district court.

**V.**

Because we conclude that Appellants' challenges are without merit, we affirm their convictions and the sentences imposed.

**AFFIRMED.**