[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 19, 2011
JOHN LEY
CLERK

No. 10-14902
Non-Argument Calendar
_____

D.C. Docket No. 1:09-cr-00158-S-GGB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDMOND HUDMOND SMITH, IV,
a.k.a. Eddie Smith,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(October 19, 2011)

Before EDMONDSON, CARNES and KRAVITCH, Circuit Judges.

PER CURIAM:

Edmond Smith, IV, appeals his convictions and 780-month sentence for two counts of retaliation against federal officials by threat, in violation of 18 U.S.C. § 115(a)(1)(B), two counts of solicitation to commit murder, in violation of 18 U.S.C. § 373(a), and one count of making false statements to federal agents, in violation of 18 U.S.C. § 1001. Smith contends that the district court abused its discretion by admitting the testimony of two witnesses regarding their reactions after hearing from federal agents about the threats that Smith had made against them. Smith also contends that his sentence is procedurally and substantively unreasonable.

I.

In March 2009 Smith was convicted after a jury trial of being a felon in possession of ammunition. Assistant United States Attorney Gregory Bordenkircher served as lead prosecutor for Smith's case, and United States District Judge William Steele presided over the trial.[1] While in jail awaiting sentencing for his conviction, Smith made multiple threats on the lives of Judge Steele and AUSA Bordenkircher in the presence of his cellmate, Paul Albert.

---

[1] Judge Steele had also presided over a 2007 civil case in which a default judgment was entered against Smith for over $1 million.

Albert, who was scheduled to be released from prison about a week before Smith's sentence hearing, informed law enforcement authorities of the threats, and the next day a federal agent equipped him with a recording device. That device recorded two conversations between Albert and Smith in which Smith discussed in detail his plans to hire a "hit man" through Albert to kill Judge Steele, Bordenkircher, and a few other individuals who were involved in his case.[2] For example, in discussing how the murders were to be carried out Smith stated:

> They need to never be able to fuckin' find a hair, a splatter, or fuckin' bullet in the wall, fuckin' nothing. They need to be wiped off the face of the earth. They need to go fuckin' look in fuckin' Kathmandu, fucking kingdom fuckin' come, where the fuck in Africa, Peru, Brazil, the fuckin' Himalayans, [sic] whereever [sic] they fuckin' look, and look, and look, and look, and look, and look, and look, they don't find any fuckin', needs to be no fuckin' heads. Needs to be no fuckin' skulls. No fuckin' teeth. No bones. They need to be, we're not payin' for them just to fuckin' be killed. We're paying for a perfect fuckin' erasing. The only one left is gonna be Curran. Understand?

When Albert questioned Smith about whether Smith would actually pay for the hit, Smith replied: "Yeah. Positive. Absolutely one hundred and ten percent sure. The only way, the only way that they're not fuckin' get [sic] paid is if I fuckin', it didn't fuckin' happen or I fuckin' die." And when Albert warned Smith of the consequences of not paying, Smith said: "Yeah, I understand it's my life. I

---

[2] Smith also planned to have three others killed as part of his scheme—a local sheriff's deputy, a former business partner, and a newspaper reporter named Eddie Curran.

understand.  You don't think I understand the seriousness of this?  Come on now. . . .  I completely understand the seriousness . . . ."  Smith also asked Albert if he was wearing a wire to which Albert replied:  "No.  Are you crazy?"

Additionally, when Albert warned Smith of the breadth of the investigation that would result from killing a federal judge and a federal prosecutor, Smith replied:  "I already knew that.  That's why I said fuckin' Steele don't need to be killed.  He needs to have a fuckin' stroke.  Bordenkircher needs to fuckin' disappear . . . .  And the only one they need to have a body for is fuckin' Curran."  When Albert asked Smith if he was sure he wanted Judge Steele and Bordenkircher killed, Smith stated:

> It's got to be done perfect and we're, we're losin' fuckin' time.  When them motherfuckers sentence me on the fuckin' seventeenth, fuckin' that judge denies all of my attorney's fuckin' motions and sends my ass to fuckin' federal prison, the game's up.  I'm, I'm left in the fuckin' hands of some motherfuckers in Atlanta that have got fuckin' political connections with these same son of a bitches here.  Come on.

In addition to making those threats and several other similar threatening statements, Smith discussed the assets he would use to pay for the murders, such as a Rolex watch, a used car, and Pancho Villa's sword, which Smith claimed were valued at over $1 million and all of which were verified by federal agents as existing assets Smith owned or had access to.  Smith also discussed his plan to

4

implicate Judge Steele, Bordenkircher, and the other individuals he planned to have killed in a criminal conspiracy to frame him through several phony emails and letters he had prepared. The emails were to be planted on the victims' computers, and the letters, which Albert was going to sneak out of prison in his cane, were to be placed at the murder scenes.

After his conversations with Albert, Smith met with an undercover police officer posing as an associate of Albert and inquired about obtaining a cell phone, which Smith needed to shore up the final details of his murderous plot and successfully orchestrate it from jail. Smith was later interviewed by federal agents and denied ever making "any comments about wanting to injure or harm Judge Steele or . . . Bordenkircher." Federal agents informed Judge Steele and Bordenkircher of the threats, but it is not clear from the record what the federal agents told them. After receiving that information, both Judge Steele and Bordenkircher took additional security measures to protect themselves and their families.

Smith was indicted on two counts of retaliation against federal officials by threat, two counts of solicitation to commit murder, and one count of making false statements to federal agents. At trial, the government introduced testimony from federal agents and other law enforcement officials involved in the undercover

5

investigation of Smith. The government also played for the jury the audio recordings of Smith's conversations with Albert and his conversation with the undercover police officer posing as Albert's associate. Over the objection of Smith, the government also introduced testimony from Bordenkircher and Judge Steele regarding the security measures they took after hearing from federal agents about Smith's threats. Smith also took the stand and testified that he did not intend to follow through on his threats. He testified that he was merely going along with Albert and putting on a show because he was fearful of Albert and his ties to a Latin gang. After a two-and-a-half day trial, the jury found Smith guilty on all five counts.

Smith's guidelines range for all five counts was a combined adjusted offense level of 44, which was adjusted down to a total offense level of 43. See U.S.S.G. ch. 5, pt. A , cmt. n.2. With a criminal history category of V, the advisory sentencing guidelines recommended a sentence of life imprisonment. After hearing arguments from both sides and considering the 18 U.S.C. § 3553(a) factors, the district court imposed consecutive statutory maximum sentences for each count resulting in a total sentence of 780 months imprisonment.

Smith contends that the district court abused its discretion by admitting the testimony of Judge Steele and Bordenkircher regarding their reactions after being

informed of the threats Smith had made and that his sentence is procedurally and substantively unreasonable.

## II.

We review a district court's evidentiary rulings only for an abuse of discretion. United States v. Wetherald, 636 F.3d 1315, 1320 (11th Cir. 2011). Errors in evidentiary rulings, however, "do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." United States v. Arbolaez, 450 F.3d 1283, 1290 (11th Cir. 2006) (quotation marks and alterations omitted). In other words, we will not reverse a conviction when the district court abuses its discretion in admitting evidence if we determine that the error was harmless. See United States v. Phaknikone, 605 F.3d 1099, 1109–11 (11th Cir. 2011). For that determination, "we view the entire record" and "[t]he government bears the burden of establishing that an error is harmless." Id. at 1109. "Overwhelming evidence of guilt is one factor that may be considered in finding harmless error." Id. (quotation omitted).

Smith's alleged errors focus on the admission of the testimony regarding the reactions of Judge Steele and Bordenkircher after federal officers informed them

of Smith's threat on their lives. But even if we assume that testimony should not have been admitted, there is no reasonable likelihood that its admission, given the other unchallenged evidence, had a substantial influence on the outcome. The federal agent in charge of the investigation testified that she put a wire on Albert after receiving information that Smith was threatening the lives of federal officials, that she found the letters Smith had written to be planted on the murder victims rolled up in Albert's cane, and that she had verified the existence of the assets Smith had said he would put up as payment for the murders.

The jury heard audio recordings of Smith's conversations with Albert in which he planned and prepared to have the judge and the prosecutor killed. Additionally, Smith testified at trial that he had no intention of following through with his murder-for-hire scheme. The jury by finding him guilty necessarily disbelieved his testimony, and that disbelief may be considered as substantive evidence against him. See United States v. Brown, 53 F.3d 312, 315 (11th Cir. 1995) ("[W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." (quotation marks omitted)). There was ample unchallenged evidence for the jury to find Smith guilty beyond a reasonable doubt, making the alleged evidentiary errors harmless.

III.

Smith also contends that his sentence is procedurally and substantively unreasonable. He argues that the district court's explanation of his sentence was inadequate, rendering the sentence procedurally unreasonable. Smith also argues that his sentence was substantively unreasonable because the statutory minimum sentence for his convictions—180 months imprisonment—would have been adequate to deter him and protect the public from future harm.

We review the reasonableness of a sentence only for an abuse of discretion, using a two-step process. United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010). First, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 597 (2007). When the district court "listen[s] to the evidence and arguments and [is] aware of the various factors [a] defendant put forward for a lesser sentence" while stating it has considered the § 3553(a) factors, it does not procedurally err by failing to give a detailed explanation of the sentence. United States v. Irey, 612 F.3d 1160, 1194–95 (11th Cir. 2010) (en banc).

9

If we find the sentence to be procedurally sound, the second step is to review the sentence's substantive reasonableness, considering "the totality of the facts and circumstances." Irey, 612 F.3d at 1189. We will vacate a sentence for substantive unreasonableness "if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Id. at 1190 (quotation marks omitted). "The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the § 3553(a) factors." Tome, 611 F.3d at 1378.

The district court's explanation for Smith's sentence was adequate. The court listened to extensive arguments from Smith's counsel and from Smith himself. The court also stated that it had reviewed the relevant portions of the record, that it had considered the § 3553(a) factors and the advisory nature of the sentencing guidelines, and that the sentence reflected "the seriousness of the offense" and met the statutory goals of punishment and general and specific deterrence. See Irey, 612 F.3d at 1194–95. Smith has not shown that his sentence was procedurally unreasonable.

He has also failed to show that his sentence was substantively unreasonable. He argues that the statutory minimum of 180 months imprisonment would have been adequate to deter him and to protect the public, even though the sentencing guidelines recommended a sentence of life imprisonment. The district court expressed concern about the seriousness of the offense and the need for just punishment and deterrence. Given the guidelines recommendation, the seriousness of the offense, the need to deter others from threatening the lives of federal officials, and the district court's careful weighing of those factors, Smith has not left us with a definite and firm conviction that the court committed a clear error of judgment by imposing a 780-month sentence.

**AFFIRMED.**