[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-11665
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:09-cr-00127-JRH-WLB-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MORGAN CHASE WOODS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(June 18, 2012)

Before TJOFLAT, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Defendant Morgan Chase Woods appeals his convictions on one count of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2), and two counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). After review and oral argument, we affirm.

## I. BACKGROUND

Defendant Morgan Chase Woods was a Navy serviceman working as an Arabic linguist and stationed at Fort Gordon, Georgia. In early 2008, his ex-wife discovered child pornography on a Hewlett-Packard ("H-P") computer that had belonged to Woods before she took the computer and moved out of their home. In February 2008, Woods's ex-wife turned the H-P computer over to the Naval Criminal Investigative Service ("NCIS"). Forensic investigators discovered images of known child pornography on the computer.

### A. May 12, 2009 Interview

On May 12, 2009, NCIS Special Agent Mary Beth Eversman, FBI Agent Brian Ozden and National Security Agency Special Agent Steve Cutcliff interviewed Woods. The interview took place at Woods's Fort Gordon workplace during his working hours. It began when Woods's chief escorted him to a private office where the agents had gathered. After Woods's chief left, the agents displayed their credentials and told Woods that they wanted to speak to him

2

because his email address had been associated with a child pornography website.[1]

The agents did not intend to take Woods into custody at this time; the agents did not handcuff Woods, and they did not tell Woods that he was under arrest. The agents were not armed. Agent Eversman later testified that Woods was free to leave or to refuse to speak to them. Woods gave no indication that he did not want to speak with the agents.

Before questioning Woods, the agents gave Woods a form entitled "Military Suspect's Acknowledgment and Waiver of Rights." Agent Eversman later testified that pursuant to the Uniform Code of Military Justice, the military must provide this waiver form to every military suspect in advance of interviewing the suspect about allegations against him, even if the suspect is not in custody. The waiver form, which Agent Eversman read aloud to Woods, stated:

> I . . . Morgan Chase Woods . . . have been advised by Special Agent(s) Mary Beth Eversman and Brian Ozden that I am suspected of receipt and/or transfer of child pornography.
>
> I have also been advised that:
> (1) I have the right to remain silent and make no statement at all;
> (2) Any statement I do make can be used against me in a trial by court-martial or other judicial or administrative proceeding;
> (3) I have the right to consult with a lawyer prior to any questioning. This lawyer may be a civilian lawyer retained by me at no cost to the United States, a military lawyer appointed to act as my counsel at no

---

[1] The agents gave Woods this false reason to protect Woods's ex-wife.

cost to me, or both;
(4) I have the right to have my retained civilian lawyer and/or appointed military lawyer present during this interview; and
(5) I may terminate this interview at any time, for any reason.

I understand my rights as related to me and as set forth above. With that understanding, I have decided that I do not desire to remain silent, consult with a retained or appointed lawyer, or have a lawyer present at this time. I make this decision freely and voluntarily. No threats or promises have been made to me.

After reading the form, Agent Eversman asked Woods if he had any questions. Woods had no questions. Agent Eversman then asked Woods to indicate that he understood his rights by initialing next to each numbered paragraph on the form. Woods initialed each of the numbered paragraphs on the waiver form. In addition, both Woods and Agent Eversman signed the bottom of the waiver form. Then, Agent Eversman asked Woods to read the last paragraph of the form and asked Woods whether he would be willing to talk with her. Woods said yes. Woods never asked for a lawyer before or during the interview.

The agents did not tell Woods that he would not be prosecuted if he cooperated. Agent Ozden testified that the agents made no threats, inducements or promises. Woods admitted that the agents made no promises to him at the time the agents advised Woods of his rights. However, Woods later testified that he was "flustered" at the time he signed the waiver form.

4

After signing the waiver form, Woods told the agents that he had viewed child pornography on his desktop computer at his current home but had received the child pornography inadvertently. Woods told the agents that he and his now ex-wife had used a different computer at their former home.[2] The interview lasted approximately 30 minutes.

## B. Search of Woods's Home and Computer

During the May 12, 2009 interview, the agents asked for Woods's consent to search his home computer. Woods agreed and signed a consent form entitled "Permissive Authorization for Search and Seizure." That consent form authorized Agents Eversman and Ozden to search Woods's residence "and any computers and/or electronic storage media located within [Woods's] residence." The consent form further authorized the NCIS "to conduct forensic reviews . . . of all electronic storage media and data files, to include text and graphical image files, contained on the electronic storage media."

After signing the consent form, Woods drove his car to his home and let the agents follow in a separate vehicle. Woods allowed Agent Ozden to access his home computer, and Ozden found images of child pornography. Agent Ozden

---

[2] The computer Woods and his ex-wife used refers to the H-P computer Woods's ex-wife turned over to the NCIS. This was a different computer from the one Woods had at his home at the time of the interview.

5

then asked Woods what Woods thought Ozden had found on the computer. Woods stated that he thought Agent Ozden had found child pornography. The agents told Woods that they would like to take the computer for further forensic examination. Woods agreed and signed another consent form. Agent Eversman then brought Woods's home computer to the NCIS evidence facility, where it was shipped to the Defense Computer Forensic Lab ("DCFL") for forensic analysis.

## C. Forensic Examination of Woods's Computers

DCFL examiners found numerous images of child pornography and one video of child pornography on the home computer Woods turned over to Agents Eversman and Ozden. Hundreds of these images matched images of known child pornography catalogued in the database maintained by the National Center for Missing and Exploited Children ("NCMEC"). Agent Eversman selected several of the images that matched images in the NCMEC database for in-depth analysis. Through in-depth analysis, NCIS investigators attempt to determine images' names[3] and origins, when the images were saved to a computer, and whether the images were copied or transferred to another computer.

DCFL performed an identical analysis on the H-P computer that Woods's

---

[3] Particular images of child pornography in wide circulation are often identified by name. For example, Woods was found in possession of a video known to be part of the "Vickie" series.

ex-wife turned over to NCIS. Forty-one of the images and one video discovered on the H-P computer matched images of known child pornography in the NCMEC database. From these matching images, an NCIS agent selected six images for in-depth analysis.

The in-depth analyses of the images retrieved from the two computers showed that the H-P user downloaded images of child pornography onto the H-P computer at various times and saved those images in obscure folders on the H-P computer. The H-P user then copied all of these images to Woods's new home computer in June 2007 and attempted to delete the images from the H-P computer around or after December 2007. The filenames of at least some of the images recovered from the two computers included obvious references to the depiction of pre-pubescent victims.[4]

## D. July 16, 2009 Interview and Written Confession

Agent Eversman and NCIS Special Agent Noah Williams interviewed Woods for a second time on July 16, 2009. This interview took place at the Army's Criminal Investigation Division office at Fort Gordon.

---

[4] For example, names of child pornography files found on Woods's computers and introduced at trial included, in relevant part, "LittlePreteenBoys8YOplus7YOKissingNakedInShower-Pedo . . ." (Exhibit 10-C); and "Vickie-pedophilia13anos" (Exhibit 9-E).

7

Before the interview, Agent Eversman again read the "Military Suspect's Acknowledgment and Waiver of Rights" form to Woods. The waiver form acknowledged that the agents advised Woods that he was suspected of "receipt and/or transfer of child pornography." After agreeing to waive his rights, Woods signed the form and initialed each paragraph of the form. The waiver form was identical to the one Woods signed on May 12, 2009. Woods did not ask any questions about the waiver and never asked for a lawyer. The agents did not tell Woods that he was under arrest before the interview and did not restrain Woods. The interview lasted approximately two hours. According to Agent Eversman, the tone of the interview was professional and non-confrontational.

After the interview, Agent Eversman told Woods that she needed to document their discussion, and invited Woods to help her prepare a written statement to ensure its accuracy. Woods agreed, and Agent Eversman typed the statement on a laptop computer as Woods sat beside her. Woods could see what Agent Eversman was typing, and at times Woods provided input with respect to the substance and language of the statement. Woods then edited a printed copy of the four-page statement. The printed statement shows that Woods struck and replaced certain words and added phrases to the statement. Woods initialed beside each paragraph and signed the bottom. In the statement, Woods acknowledged

8

making the statement "of [his] own free will and without any threats made to [him] or promises extended."

Woods's statement affirmed that he had searched for and downloaded child pornography and estimated that he had "a couple hundred images of nude children on [his] computer, and these children were either posed in a sexually provocative manner or engaged in sexual acts." Woods stated that he used the child pornography "for both reference, and [his] sexual arousal."

Woods's statement also acknowledged "several incidents" of his rubbing his sleeping niece's "legs, buttocks, and vagina." Woods was 16 to 17 years old at the time of these incidents.[5] Woods stated that he had not engaged in similar activity since that time because he had concluded that he had only "envious admiration as opposed to a direct desire for such interaction with minors."

## E. Indictment

In August 2009, a three-count indictment charged Woods with one count of receiving child pornography and two counts of possessing child pornography. Specifically, Count 1, the receiving count, charged Woods with "knowingly" receiving or attempting to receive at least ten electronic images containing child

---

[5] The statement does not indicate how old Woods's niece was at the time of these incidents.

pornography between November 2006 and May 12, 2009, in violation of 18

U.S.C. § 2252A(a)(2). Counts 2 and 3, the possession counts, charged Woods,

respectively, with "knowingly" possessing more than ten electronic images

containing child pornography on his home computer, between on or about June 24,

2007 and May 12, 2009, in violation of 18 U.S.C. § 2252A(a)(5)(B); and

"knowingly" possessing more than ten electronic images containing child

pornography on his H-P computer between June 2005 and December 2007, in

violation of 18 U.S.C. § 2252A(a)(5)(B). Each count of the indictment defined

child pornography as depictions of "individual[s] who had not attained the age of

eighteen, engaged in sexually explicit conduct." In February 2010, the

government provided Woods with a bill of particulars describing in detail the

specific, separate images it would use to prove each count of the indictment.

## F. Motion to Suppress

Before trial, Woods moved to dismiss the indictment on grounds that the

child pornography statutes under which he was charged were vague and

overbroad. The district court denied Woods's motion.

Woods also moved to suppress his statements to federal agents during the

May 12, 2009 and July 16, 2009 interviews on grounds that (1) the agents wrongly

advised Woods that he was entitled to the presence of a civilian lawyer only if he

could afford one, and (2) Woods did not freely and voluntarily waive his Fifth Amendment rights to counsel and to remain silent.

The magistrate judge held an evidentiary hearing on Woods's motion to suppress. At the hearing, Agent Eversman and Agent Ozden testified regarding the circumstances of the May 12, 2009 and the July 16, 2009 interviews with Woods.

Woods testified that he graduated high school and became an Arabic linguist after 18 months of military language training. Woods recalled that on May 12, 2009, his supervisor told him that he wanted to take Woods to a meeting and led Woods to an office in the secure facility where Woods worked. When he arrived at the office, Agents Eversman, Ozden and Cutcliff said they wanted to ask Woods a few questions. Woods stated at the suppression hearing that he did not feel that he was free to leave the meeting. Woods testified that Agent Eversman read the rights waiver aloud while he followed along, and that he understood the waiver form to mean that he would be allowed a civilian lawyer only if he could afford one, which he could not. Woods conceded that Agent Eversman told him to initial only the parts of the waiver form he understood and that Woods initialed each numbered paragraph, including those advising of his right to silence and the presence of a lawyer.

As to the July 16, 2009 interview, Woods testified that he did not feel free to leave because (1) he was brought to the interview in a car, (2) had no transportation of his own, and (3) the interview was "accusational" in nature. Woods stated that Agent Eversman again read the rights waiver aloud while he followed along. Woods claimed again that he understood the waiver form to mean that he would be allowed a civilian lawyer only if he could afford one, which he could not. Woods did not dispute that he signed the second waiver form, but claimed that he was "very flustered" at the time and "wasn't paying nearly as good of attention as [he] should have been when [he] was signing." Woods also claimed that he was "flustered" at the time he made notes and revisions to the written statement Agent Eversman typed with Woods's help after the July 16 interview.

As to both the May 12, 2009 and the July 16, 2009 interviews, Woods stated that he never asked the agents about his rights at any time and that the agents made no promises to him. Importantly, Woods never stated at the suppression hearing that he did not know he had the right to have a military lawyer present during the interviews on May 12, 2009 or July 16, 2009, or that he did not understand the waiver forms he signed before each interview.

In a lengthy Report and Recommendation ("the Report"), the magistrate

12

judge recommended that the district court deny Woods's motion to suppress. The magistrate judge explained that, under <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966), Woods was entitled to the presence of "a" lawyer during questioning, not "any particular 'type' of attorney." Accordingly, the waiver form's warnings that Woods had the right to a military lawyer at no cost to him and a civilian lawyer at no cost to the United States were consistent with <u>Miranda</u> and accurately stated Woods's Fifth Amendment rights.[6] The magistrate judge explained: "That the appointed lawyer would have been a military lawyer rather than a civilian lawyer is of no consequence because Woods was offered 'an' appointed lawyer to protect his Fifth Amendment rights." The magistrate judge concluded that Woods's custodial status at the two interviews was irrelevant because the warnings provided to Woods satisfied <u>Miranda</u>.

Next, the magistrate judge found that Woods voluntarily, knowingly, and intelligently made statements after being advised of his Fifth Amendment rights. The magistrate judge noted that (1) Woods's interactions with agents took place at "the familiar locations of Woods's place of employment and at his residence"; (2)

---

[6] The magistrate judge noted that Woods's Sixth Amendment right to counsel was not at issue because formal judicial proceedings had not been instituted against Woods at the time of either the May 12, 2009 or the July 16, 2009 interviews. <u>See</u> <u>United States v. Hidalgo</u>, 7 F.3d 1566, 1569 (11th Cir. 1993) (explaining that the Sixth Amendment right to counsel attaches only after adversarial judicial proceedings are initiated against a defendant).

agents promptly informed Woods of his rights before both interviews; (3) Woods's rights were explained to him orally and in writing; (4) Woods testified that he understood those rights as they were explained to him; (5) Woods conceded that the agents made no promises to him; (6) Woods cooperated with agents throughout their investigation; and (7) the May 12, 2009 interview lasted only 30 minutes, and the July 16, 2009 interview lasted only two hours. These circumstances convinced the magistrate judge that Woods "waived his rights with the requisite level of comprehension."

The district court adopted the magistrate judge's Report and denied Woods's motion to suppress.

## G. Trial and Conviction

At trial, Woods argued that (1) the government's forensic recovery of data from the H-P computer and Woods's home computer was flawed; (2) Woods's ex-wife had access to the H-P computer long after Woods had allegedly downloaded child pornography to that computer; and (3) the government failed to account for the possibility that Woods's roommates had downloaded the child pornography to Woods's home computer.

During the trial, Woods moved for a mistrial due to, inter alia, the government's references to Woods's alleged sexual molestation of his niece. The

14

district court denied Woods's motion for a mistrial.

On October 6, 2010, a jury convicted Woods on all three counts. The district court sentenced Woods to 135 months' imprisonment as to Count 1, and 120 months' imprisonment as to each of Counts 2 and 3, all to be served concurrently.

Woods appeals his convictions on various grounds.

## II. DISCUSSION

### A. Suppression of Woods's Statements

Woods argues that his statements during the May 12, 2009 and July 16, 2009 interviews should have been suppressed because the waiver form, which Agent Eversman read and Woods signed, was "confusing, misleading and constitutionally deficient." Specifically, Woods claims that the waiver form, instead of simply stating that he had the right to have an attorney present during questioning, drew a confusing distinction between a retained civilian attorney and an appointed military attorney. Further, Woods argues that the waiver form's distinction was incorrect because if Woods faced civilian charges, he would be entitled to an appointed civilian attorney if he could not afford one.[7]

---

[7] "[W]here there is no factual dispute as to whether Miranda warnings were given, what questions were asked and what answers given, we review the district court's denial of the motion to suppress de novo." United States v. Kerr, 120 F.3d 239, 241 (11th Cir. 1997).

15

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under the Fifth Amendment, statements a defendant makes during a custodial interrogation may not be used against him in court unless the government first advises the defendant of his rights as set forth in Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993). These rights include the right to silence, the right to have an attorney present during interrogation, and if the defendant is indigent, the right to have a lawyer appointed for him. Miranda, 384 U.S. at 479, 86 S. Ct at 1630. The Miranda warnings need not be perfect; rather, the warnings need only "reasonably convey[]" the defendant's rights. Florida v. Powell, 130 S. Ct. 1195, 1205 (2010); see California v. Prysock, 453 U.S. 355, 359, 101 S. Ct. 2806, 2809 (1981) (explaining the Supreme Court "has never indicated that the rigidity of Miranda extends to the precise formulation of the warnings given a criminal defendant. . . . Quite the contrary, Miranda itself indicated that no talismanic incantation was required to satisfy its strictures." (internal quotation marks omitted)). Furthermore, Miranda applies only to situations of custodial interrogation. J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011).

The district court never reached the issue of custody, and neither do we.

16

Even assuming arguendo that Woods was in custody on both May 12 and July 16, 2009, and therefore was entitled to Miranda warnings, the waiver forms that Agent Eversman read aloud and Woods signed and initialed reasonably and adequately conveyed Woods's Fifth Amendment rights under Miranda.

As noted above, the waiver forms stated, in relevant part:

(3) I have the right to consult with a lawyer prior to any questioning. This lawyer may be a civilian lawyer retained by me at no cost to the United States, a military lawyer appointed to act as my counsel at no cost to me, or both;
(4) I have the right to have my retained civilian lawyer and/or appointed military lawyer present during this interview . . . .

These warnings expressly apprised Woods of his right to have a lawyer appointed at no cost to him, to consult that lawyer before questioning, and to have the lawyer present during questioning. These statements are consistent with Miranda, which protects a person's right to "a" lawyer or "an" attorney, but not a lawyer or attorney of any particular type. See, e.g., Miranda, 384 U.S. at 444, 470, 86 S. Ct. at 1216, 1626. Woods cites no case suggesting that Miranda requires more. Although Woods was entitled to a lawyer before and during questioning, he was not entitled to a particular kind of lawyer, whether military or civilian.[8]

---

[8] As the magistrate judge correctly observed, Woods's Sixth Amendment right to counsel had not yet attached because formal judicial proceedings had not been instituted against Woods at the time of either the May 12, 2009 or the July 16, 2009 interviews. See United States v. Hidalgo, 7 F.3d 1566, 1569 (11th Cir. 1993). Accordingly, we need not discuss whether Woods would have been entitled to the appointment of a particular type of lawyer after he was charged

Further, the waiver forms' statement—that his lawyer may be a civilian lawyer retained by him "at no cost to the United States"—did not make the warnings "confusing" or "misleading." The forms made it clear that before any questioning took place, Woods could retain his own lawyer or a military lawyer would be provided at no cost to him. See Powell, 130 S. Ct. at 1204–05 (holding that warnings "reasonably conveyed" defendant's right to have an attorney present at all times). In sum, the language of the waiver forms reasonably, clearly and accurately conveyed Woods's Fifth Amendment rights under Miranda, and the waiver forms' qualification of Woods's entitlement to a civilian lawyer does not invalidate the otherwise adequate statements of Woods's rights.

## B. Other Issues Regarding Woods's Statements

We also reject Woods's claim that the district court abused its discretion by admitting Woods's statements at trial without first requiring the government to introduce evidence that Woods provided the statements voluntarily.[9] As noted above, the magistrate judge held a pretrial hearing on Woods's motion to suppress

---

by civilian authorities. Rather, in this case we address only the Fifth Amendment and Miranda's rule designed to preserve Woods's Fifth Amendment right against self-incrimination.

[9] Woods's brief does not clarify whether this claim refers to his written statement, his oral statements at the May 12, 2009 and July 16, 2009 interviews, or both. We presume Woods appeals the admission of both his written and oral statements.

his statements at the May 12, 2009 and July 16, 2009 interviews. In the thorough Report, the magistrate judge found that Woods knowingly and voluntarily waived his Miranda rights. The district court adopted that Report and denied Woods's motion to suppress. Woods cites no authority holding that the government was required again to prove the voluntariness of Woods's statements before the district court admitted Woods's statements in evidence. The jury is not required to make an independent finding on whether a defendant's confession was voluntary. See United States v. Nash, 910 F.2d 749, 756–57 (11th Cir. 1990).

In any event, the government provided ample evidence at trial that Woods made these statements voluntarily in the form of witness testimony describing the circumstances of the May 12, 2009 and July 16, 2009 interviews, the contents of the waiver forms Woods signed, and Woods's participation in the drafting of his statement after the July 16 interview.

## C. Vagueness and Overbreadth of 18 U.S.C. § 2252A(a)(2) and (a)(5)(B)

Woods next claims that the child pornography statutes here are unconstitutionally vague and overbroad.[10] A statute is void for vagueness if it

---

[10] This Court reviews de novo a district court's determination that a statute is not unconstitutionally vague or overbroad. United States v. Waymer, 55 F.3d 564, 568 (11th Cir. 1995).

"fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304, 128 S. Ct. 1830, 1845 (2008); accord United States v. Wayerski, 624 F.3d 1342, 1347 (11th Cir. 2010). A statute is facially overbroad if it prohibits a substantial amount of protected speech "relative to the statute's plainly legitimate sweep." Williams, 553 U.S. at 292, 128 S. Ct. at 1838.

We begin with the text of the two relevant statutes. As to receipt of child pornography, 18 U.S.C. § 2252A(a)(2) makes it a crime for any person to:

> knowingly receive[] or distribute[]–
> (A) any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; or
> (B) any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer . . . .

As to possession of child pornography, 18 U.S.C. § 2252A(a)(5)(B) makes it a crime for any person to:

> knowingly possess[][11] any book, magazine, periodical, film, videotape,

---

[11] In October 2008, Congress added "or knowingly access[] with intent to view" to the statute. Pub. L. No. 110-358, § 203(b), 122 Stat. 4001 (2008) (emphasis added). The indictment

computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce . . . including by computer . . . .

Woods argues that these receipt and possession statutes are unconstitutionally vague because the statutory language is unclear whether a person who merely views child pornographic images on his computer—versus a person who actually downloads copies of those images to a hard-drive—has "knowingly receive[d]" or "knowingly possesse[d]" those images.

Our recent decision in United States v. Pruitt, 638 F.3d 763 (11th Cir.), cert. denied, 132 S. Ct. 113 (2011), about the receipt statute, sheds light on this issue. In Pruitt, the defendant challenged the sufficiency of the evidence of his conviction for receipt of child pornography under § 2252A(a)(2)(A) because the evidence showed he had viewed child pornography on his work computer but had not downloaded the offending images to the computer's hard drive. Pruitt, 638 F.3d at 765–66. We affirmed the defendant's receipt conviction because a person "knowingly receives" something when he "knowingly accept[s]" or "take[s] possession or delivery of" that thing or "take[s] in [that thing] through the mind or senses." Id. at 766 (internal quotation marks omitted). Accordingly, Pruitt held

here did not charge Woods with this new, alternative prong of the statute.

21

that "[u]nder [§ 2252A(a)(2)'s] 'knowingly receives' element, an intentional viewer of child-pornography images sent to his computer may be convicted whether or not, for example, he acts to save the images to a hard drive . . . ." Id.

Pruitt was not a vagueness case. But Pruitt's construction of § 2252A(a)(2) shows why that receipt statute is not vague on the basis argued by Woods.[12] Pruitt's holding flowed from the "ordinary meaning" of the words "knowingly" and "receive." Id. As Pruitt pointed out, those words clearly convey that a person who "intentionally views, acquires, or accepts child pornography on a computer from an outside source" violates § 2252A(a)(2)(A). Id. The clarity of the statute's plain language thus shows why the receipt statute provides "a person of ordinary intelligence fair notice of what is prohibited" and does not authorize or encourage "seriously discriminatory enforcement." Williams, 553 U.S. at 304, 128 S. Ct. at 1845.

Similar reasoning applies to the possession statute, § 2252A(a)(5)(B). First, we explain why the possession statute, like the receipt statute, applies to a person who knowingly views child pornography on his computer, but does not download

_____

[12] As Woods notes, Pruitt was decided after Woods engaged in the conduct that led to his conviction. Accordingly, Pruitt itself could not have put Woods on notice that merely viewing child pornography on a computer, versus downloading and saving child pornography to the hard drive, was conduct prohibited by § 2252A(a)(2)(A). Nonetheless, Pruitt's construction of the ordinary terms used in § 2252A(a)(2)(A) shows why the statute is not vague.

22

or save that material to a hard drive.  To do so, we discuss United States v. Bobb,

577 F.3d 1366, 1373 (11th Cir. 2009), in which this Court already concluded that

"receipt" necessarily proves "possession," and that therefore the possession crime

in § 2252A(a)(5)(B) is a lesser included offense of the receipt crime in

§ 2252A(a)(2)(B).[13]

In Bobb, the defendant was convicted of receiving child pornography, in

violation of § 2252A(a)(2)(B), and possessing child pornography, in violation of

§ 2252A(a)(5)(B).  Bobb, 577 F.3d at 1369–70.  The defendant claimed that his

convictions violated the Double Jeopardy Clause because the receipt and

possession statutes criminalized the same conduct.  Id. at 1370–71.  This Court

agreed that "these provisions, indeed, proscribe the same conduct" because "by

proving that a person 'knowingly receives' child pornography, the Government

---

[13] We note that in Bobb, the defendant was convicted of receipt of child pornography
under § 2252A(a)(2)(B), while this case involves receipt under the adjacent subsection,
§ 2252A(a)(2)(A).  However, these statutes proscribe virtually the same conduct.  Section
2252A(a)(2) makes it a crime to:
    knowingly receive[] or distribute[]—
    (A) any child pornography . . . ; or
    (B) any material that contains child pornography . . . .
Bobb's reasoning, which relied on the relationship between the words "receive" and "possess," is
applicable to receipt under both subsections (A) and (B).  Indeed, the defendant in Bobb argued
that the possession statute was a lesser included offense of both subsections (A) and (B).  See
Bobb, 577 F.3d at 1373 (explaining that defendant argued "that the offenses described in 18
U.S.C. § 2252A(a)(2) (prohibiting receipt) comprise a subset of offenses described in 18 U.S.C.
§ 2252A(a)(5)(B) (prohibiting possession)" (emphasis added)).

23

necessarily proves that the person 'knowingly possesses' child pornography." Id. at 1373. We nonetheless affirmed the defendant's receipt and possession convictions in Bobb because there the defendant's "convictions and sentences were based on two distinct offenses, occurring on two different dates, and proscribed by two different statutes." Id. at 1375.

Reading our precedents together, we see that (1) Pruitt held that a person who "knowingly" views child pornography on a computer, but does not download it, "receives" child pornography; and (2) Bobb held that "receipt" necessarily entails "possession." Thus, these precedents, taken together, show that a person who intentionally views, but does not download, child pornography necessarily "possesses" child pornography within the meaning of § 2252A(a)(5)(B). The issue thus becomes whether § 2252A(a)(5)(B) provides "a person of ordinary intelligence fair notice" that it prohibits such conduct. Williams, 553 U.S. at 304, 128 S. Ct. at 1845.

As with the receipt statute, the ordinary meaning of the terms in the possession statute show why it is not unconstitutionally vague. "'Possession' is 'the act or condition of having in or taking into one's control or holding at one's disposal.'" United States v. Frank, 599 F.3d 1221, 1234 (11th Cir. 2010) (quoting

24

Webster's Third New International Dictionary 1770 (Philip Babcock Gove et al. eds., 1981)).  One who "knowingly" views images of child pornography on a computer, even without downloading or saving those images to the computer's hard drive, takes those images into his control and has those images at his disposal.  He may save those images to a different location on the computer, transmit the images over the internet, or show those images to others.  Like the receipt statute, the terms of the possession statute thus provide "a person of ordinary intelligence fair notice of what is prohibited" and do not authorize or encourage "seriously discriminatory enforcement."  Williams, 553 U.S. at 304, 128 S. Ct. at 1845.  A statute is not unconstitutionally vague for failing to describe explicitly the range of ways in which the statute can be violated.  See United States v. Martin, 747 F.2d 1404, 1409 (11th Cir. 1984) ("Congress may use a term that conveys the type of conduct regulated rather than enumerate all the specific instances within the legislation.").

Woods's vagueness argument also fails because Woods himself knowingly saved child pornography to the hard drives of his two computers, and "one to whose conduct a statute clearly applies may not successfully challenge it . . . for vagueness."  Bama Tomato Co. v. U.S. Dep't of Agric., 112 F.3d 1542, 1547 (11th

25

Cir. 1997) (internal quotation marks omitted); see Catron v. City of St. Petersburg, 658 F.3d 1260, 1271 (11th Cir. 2011) (stating that party whose own conduct is clearly proscribed by statute cannot successfully challenge statute for vagueness either facially or as applied); United States v. Wetherald, 636 F.3d 1315, 1326 (11th Cir. 2011) (explaining that when a vagueness challenge does not involve the First Amendment, the analysis must be based on the facts of the case), cert. denied, 132 S. Ct. 360 (2011), and 132 S. Ct. 1002 (2012), and 132 S. Ct. 1582 (2012). Woods admitted that he downloaded child pornography to both his H-P computer and his home desktop computer. Forensic analysis confirmed that child pornography files were saved to the H-P computer and later transferred and saved to Woods's home computer. Woods's ex-wife also testified that she discovered sexually explicit images of children on the H-P computer she shared with Woods. Woods makes no claim that he merely viewed child pornographic images without downloading them. Nor does Woods claim that his downloading and viewing of child pornography are constitutionally protected conduct. Because the language of § 2252A(a)(2) and (a)(5)(B) is not vague as applied to Woods's conduct, Woods's facial and as-applied vagueness challenges fail. See Catron, 658 F.3d at 1271.

We also conclude that the child pornography receipt and possession statutes

are not overbroad. As noted above, a statute is overly broad only if it prohibits a substantial amount of protected speech in relation to the statute's legitimate sweep. Williams, 553 U.S. at 292, 128 S. Ct. at 1838. The statutes Woods challenges prohibit only the knowing receipt or possession of "child pornography." 18 U.S.C. § 2252A(a)(2), (a)(5)(B). Child pornography is not speech protected by the First Amendment. New York v. Ferber, 458 U.S. 747, 758, 765, 102 S. Ct. 3348, 3355, 3359 (1982); United States v. Miller, 776 F.2d 978, 980 n.4 (11th Cir. 1985). Accordingly, the two statutes' very terms restrict their application to speech unprotected by the First Amendment.

In criminalizing this unprotected conduct or speech, the statutes prohibit little, if any, protected speech or conduct. The statutes criminalize only "knowing" possession or receipt of child pornography, which eliminates the possibility that an unwitting downloader of child pornography will trigger liability under the statutes. Though Woods identifies some problematic hypothetical applications of these statutes, Woods has not demonstrated that these applications are substantial in relation to the statutes' legitimate sweep. These statutes do not offend the First Amendment in the vast majority of applications, and "[t]he mere fact that one can conceive of some impermissible applications of a statute is not

sufficient to render it susceptible to an overbreadth challenge." Id. at 303, 128 S. Ct. at 1844 (internal quotation marks omitted).

## D. Multiplicitous Indictment

Woods next claims that his indictment is multiplicitous. "An indictment is multiplicitous if it charges a single offense in more than one count." United States v. Jones, 601 F.3d 1247, 1258 (11th Cir. 2010) (internal quotation marks omitted). A multiplicitous indictment "violates double jeopardy principles by giving the jury more than one opportunity to convict the defendant for the same offense." Id. A multiplicitous-indictment challenge is subject to the same standard as a double jeopardy challenge. Id. Accordingly, charges in an indictment are not multiplicitous if the charges differ by even a single element or alleged fact.[14] United States v. Costa, 947 F.2d 919, 926 (11th Cir. 1991).

Woods's argument relies on our decision in United States v. Bobb, discussed above, holding the possession statute, 18 U.S.C. § 2252A(a)(5)(B), is a lesser included offense of the receipt statute, § 2252A(a)(2). 577 F.3d at 1373–75. Woods argues that under Bobb, where an indictment charges both possession and receipt of child pornography, "there must be allegations and proof of separate,

---

[14] We review de novo a claim that an indictment is multiplicitous. Jones, 601 F.3d at 1258.

distinct downloadings of pornography."

Woods's claim wholly lacks merit, because, as in <u>Bobb</u>, each count of the indictment alleges that Woods engaged in the charged conduct during a different time period. Count 1 charges that Woods received or attempted to receive child pornography between November 2006 and May 12, 2009, which corresponds to the time between when Woods and his ex-wife moved to Georgia and when Woods surrendered his home desktop computer to federal agents. Count 2 charges that Woods possessed child pornography between June 24, 2007 and May 12, 2009, which corresponds to the time between when Woods copied the files from the H-P computer to his home computer and when Woods surrendered his home computer to federal agents. Count 3 charges that Woods possessed child pornography between June 2005 and December 2007, which corresponds to the time <u>before</u> Woods's ex-wife moved out and took the H-P computer. <u>See</u> <u>Bobb</u>, 577 F.3d at 1375 (holding that indictment charged two separate offenses in part because charged offenses occurred on two different dates).

Though these date ranges partially overlap, each range in each count has a span of dates not covered by the time period in the other counts. And indeed, two counts involve different computers. Nothing in the indictment indicated that the

same images underlying the receipt count underlie the possession counts.

In any event, the government's bill of particulars confirmed there is no multiplicity of the charges here. The bill of particulars, which the government provided Woods in February 2010, described each of the images or videos the government would rely on to prove each count of the indictment, and no single downloaded image or video constituted the basis for multiple charges.[15] See United States v. Schmitz, 634 F.3d 1247, 1260 n.8 (11th Cir. 2011) (explaining that a bill of particulars may cure notice problems caused by a vague term in an indictment); United States v. Perkins, 748 F.2d 1519, 1526 (11th Cir. 1984) (noting that a bill of particulars can cure an indictment's omission of details needed to help defendant prepare defense). Accordingly, each of the three counts in the indictment rested on at least one fact or element different from the others, and the indictment itself was not multiplicitous. See Costa, 947 F.2d at 926.[16]

**E. Admission of Testimony Mentioning Images in NCMEC Database**

Woods also raises evidentiary issues which first require some background about what happened at trial.

---

[15] Indeed, the government points out that Woods does not claim that the bill of particulars included the same image as evidence of more than one count.

[16] We also reject Woods's claim that the trial evidence constructively amended and unconstitutionally varied from Woods's indictment.

In his opening argument, Woods's counsel argued that Woods was the victim of a "sloppy" police investigation. Specifically, Woods's counsel argued to the jury that (1) the government "made a conscious decision to try to prejudice you against [Woods] over here by the selections [of images] that they made"; (2) the government "decided to make [the images] just as bad as they could hoping that would fire y'all up to just convict him because they're just such nasty pictures"; and (3) "[t]here are manipulations of the images as to the image descriptions, the number and type."

Later, during its case in chief, the government asked Agent Eversman and DCFL forensic examiner James Morris to describe how they recovered data from Woods's computers and how they decided which of the hundreds of images recovered to submit for in-depth analysis. Agent Eversman and Morris testified that they verified which of the files on Woods's computers matched images and videos in the NCMEC database and selected several of those matching files for in-depth analysis. Morris testified that agents selected for in-depth analysis images that matched NCMEC database images because the government did not have the time or resources to perform an in-depth analysis on all of the images recovered from Woods's computers. Morris stated that DCFL lab policy is to perform in-

31

depth analysis on no more than 25 images without additional authorization.

Woods's counsel objected multiple times to Agent Eversman's and Morris's testimony on grounds that their suggesting Woods's files matched those in the NCMEC database (1) was unauthenticated evidence; (2) was inadmissible hearsay; (3) denied Woods's Sixth Amendment right to confront witnesses regarding this evidence; and (4) was unfairly prejudicial. The district court overruled Woods's objections. On appeal, Woods raises each of these challenges. We review them in turn.[17]

Under Federal Rule of Evidence 901(a), an "item" of evidence is not admissible at trial unless and until it is properly authenticated by evidence "sufficient to support a finding that the item is what the proponent claims." Fed. R. Evid. 901(a). Here, Woods's counsel did not object to the introduction of any "item" of evidence. Rather, Woods's counsel objected only to testimony that the government's ordinary forensic process showed that some of the images and videos discovered on Woods's computer matched those in the NCMEC database. Accordingly, the authentication requirement, which applies only to "an item of

_____

[17] This Court reviews a district court's evidentiary rulings for abuse of discretion. United States v. McGarity, 669 F.3d 1218, 1232 (11th Cir. 2012). "If, however, the objection raises the right to confront witnesses, we review it de novo." United States v. Langford, 647 F.3d 1309, 1319 (11th Cir. 2011), cert. denied, 132 S. Ct. 1121 (2012).

32

evidence," is inapplicable, and the district court did not abuse its discretion by overruling Woods's objections on these grounds. Id.

We also conclude that the district court did not abuse its discretion by overruling Woods's hearsay and Confrontation Clause objections. Relevant evidence may be excluded if it is inadmissible hearsay. See Fed. R. Evid. 802. Hearsay is an out-of-court statement made "to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2).

In explaining how the DCFL and NCIS recovered data from Woods's computers and decided which images to subject to in-depth analysis, Agent Eversman and Morris testified that images found on Woods's computers matched images in the NCMEC database. Assuming without deciding that these matches were out-of-court "statements" within the meaning of Federal Rule of Evidence 801(a),[18] this testimony was not introduced to prove the truth of the matter asserted, i.e., that the images found on Woods's computer matched images of known child pornography. See Fed. R. Evid. 801(c)(2). Rather, the testimony explained how the government selected which images recovered from Woods's

---

[18] The Federal Rules of Evidence define a "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a).

computers to subject to in-depth analysis.  This purpose was particularly evident

given Woods's counsel's attack on the integrity of the government's forensic

techniques, especially Woods's counsel's claims to the jury that the government

selected images to use against Woods on the basis of those images' inflammatory

effects.

By eliciting testimony about the NCMEC matches, the government showed

that it selected images for in-depth analysis based on the likelihood that in-depth

analysis would reveal useful information about the images, rather than pursuant to

an illicit or improper motive.[19]  See United States v. Baker, 432 F.3d 1189, 1208

n.17 (11th Cir. 2005) ("Statements by out of court witnesses to law enforcement

officials may be admitted as non-hearsay if they are relevant to explain the course

of the officials' subsequent investigative actions . . . .").  Accordingly, testimony

about the NCMEC database matches was not hearsay under Federal Rule of

---

[19] The government's closing argument confirms that Agent Eversman's and Morris's testimony was not offered to prove the images in fact matched images in the NCMEC database, but merely to explain the selection process for in-depth analysis.  The government told the jury:

> I will note that there has been evidence in the case about references to NCMEC and its known database.  The purpose of that was just to explain the forensic process.  It's really up to you to determine whether or not there are real children in these pictures, whether or not they were minors at the time that the images were taken, and whether or not they are sexually explicit in nature.

Evidence 801(c).[20]

Last, we reject Woods's argument that this testimony was unfairly prejudicial and should have been excluded. Under Rule 403, the district court may exclude otherwise-admissible evidence "if its probative value is substantially outweighed" by the danger, inter alia, of unfair prejudice to the defendant. Fed. R. Evid. 403. The courts must employ Rule 403 "only sparingly since it permits the trial court to exclude concededly probative evidence." United States v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006).

There is no question that testimony that files on Woods's computer matched those in the NCMEC database was relevant and probative of the government's forensic techniques and helped to show, contrary to Woods's counsel's assertions, that the government did not select evidence pursuant to an improper motive. This testimony was not substantially outweighed by the danger of unfair prejudice, especially given the volume and nature of the evidence at trial showing that Woods had downloaded child pornography. This evidence included (1) Woods's own written confession that he had downloaded hundreds of images of child

---

[20] Because the admitted testimony was not hearsay, Woods's Confrontation Clause challenge also fails. See United States v. Jiminez, 564 F.3d 1280, 1286 (11th Cir. 2009) ("There can be no doubt that the Confrontation clause prohibits only statements that constitute impermissible hearsay.").

pornography; and (2) the testimony of both Woods's ex-wife and forensic expert Morris, who each testified that, based on their personal observations, the images on Woods's computers were child pornography; (3) Agent Ozden's testimony that the images he viewed on Woods's home computer were child pornography; (4) Woods's statement to Agent Ozden that he thought Ozden had discovered child pornography on Woods's computer; (5) the nature of the images on Woods's computers, which depicted pre-pubescent minors that could not reasonably be confused with adults; (6) the names of Woods's computer files containing child pornography, which included obvious references to the fact that the images depicted children.[21]

Further, at the close of the trial, the district court instructed the jury that the jury was to decide whether the individuals depicted in the images were minors. The district court's jury instructions stated:

> As part of the Government's case, evidence has been admitted, including images which the Government asserts depict actual minors. It is for you to determine, based upon all the evidence before you, whether actual minors are depicted in the images.

This instruction further emphasized that the jury itself was to determine whether Woods's images were child pornography. See United States v. Fortenberry, 971

---

[21] See supra n. 4.

F.2d 717, 721 (11th Cir. 1992) (noting that limiting instructions minimize the prejudicial effect of evidence).[22]

In sum, the district court did not abuse its discretion by admitting Agent Eversman's and Morris's testimony over Woods's counsel's objections.

## F. Admission of Other Acts Evidence

At trial, Woods objected to the admission into evidence of the portion of his typed statement describing his molestation of his niece, which the district court admitted under Federal Rule of Evidence 414. Woods also moved for a mistrial. Woods now argues that this evidence was unfairly prejudicial and deprived him of a fair trial.[23]

Under Federal Rule of Evidence 414(a):

In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another

---

[22] We further note that Woods's defense at trial was that the government could not show that Woods, as opposed to Woods's ex-wife or his roommates, received and possessed the images and videos found on the two computers, not that the images and videos did not depict actual minors.

[23] We construe Woods's presentation of this issue on appeal as an argument that the relevant portion of Woods's written statement should have been excluded under Federal Rule of Evidence 403. To the extent Woods argues in his opening brief that Rule 414 is unconstitutional, Woods has abandoned this issue by failing to develop any argument on it in his opening brief. See United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (deeming an issue abandoned when a defendant merely makes a passing reference to an alleged error in his brief).
We review a district court's evidentiary rulings and denial of a motion for a mistrial for abuse of discretion. McGarity, 669 F.3d at 1232.

offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.[24]

Rule 414 defines "offense of child molestation" as, among other things, a crime involving "any conduct proscribed by chapter 110 of title 18, United States Code." Fed. R. Evid. 414(d)(2).  Woods was charged under 18 U.S.C. § 2252A(a)(2) (receipt of child pornography) and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography), both of which fall under chapter 110 of title 18.  Accordingly, admission of Woods's statement about molesting his niece was proper under Rule 414 so long as this evidence satisfied the other Rules of Evidence, including Rule 403.  See United States v. McGarity, 669 F.3d 1218, 1244 (11th Cir. 2012).

As discussed above, under Rule 403, the district court may exclude otherwise-admissible evidence if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant.  Fed. R. Evid. 403.  In McGarity, we considered a nearly identical Rule 403 challenge to the admission of the defendant's written statement detailing "his prior fondling, touching, and molestation of his two-year-old daughter some nine years earlier."  669 F.3d at

---

[24] Rule 414 was amended in December 2011.  However, even if that amendment were retroactive, the amendment was stylistic only and does not change the outcome of our inquiry.  See Fed. R. Evid. 414 advisory committee's note ("These changes are intended to be stylistic only.  There is no intent to change any result in any ruling on evidence admissibility.").  All quotations of Rule 414 reflect the pre-amendment language.

1243. In that case, we rejected defendant McGarity's claim that the probative value of this statement was substantially outweighed by the danger of unfair prejudice, in part because McGarity's statement showed that he was the person who had trafficked in the child pornography admitted in evidence. Id. at 1244–45 ("The nature of McGarity's crime was intended to avoid detection."). Similarly, Woods argued at trial that the government could not prove that Woods—as opposed to Woods's ex-wife or Woods's roommates—had received and possessed the child pornography found on the two computers. Like McGarity's statement, Woods's statement describing his molestation of his niece was probative of Woods's interest in child pornography and therefore made it more likely that Woods, and not his ex-wife or roommates, was responsible for the child pornography found on the two computers. The district court therefore did not abuse its discretion by admitting the evidence under Rules 414 and 403 and by denying Woods's motion for a mistrial.

## G. Prosecutor's Closing Argument

Woods next claims that the prosecutor's closing argument constituted prosecutorial misconduct and denied Woods a fair trial.[25] "Reversal on the basis

---

[25] This Court reviews de novo a claim of prosecutorial misconduct. United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006).

of prosecutorial misconduct requires that the misconduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." United States v. Crutchfield, 26 F.3d 1098, 1099 (11th Cir. 1994) (internal quotation marks omitted). "For a claim of prosecutorial misconduct relating to the closing argument to be successful, the argument must be improper and prejudicial to a substantial right of the defendant." United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997). A defendant's substantial rights are prejudiced if there is a reasonable probability that, but for the improper remarks, the outcome of the trial would have been different. United States v. Adams, 74 F.3d 1093, 1097 (11th Cir. 1996).

Woods does not identify any particular improper statement the prosecutor made during the closing argument. Rather, Woods claims only that the prosecutor "fanned and inflamed the jury against him concerning such information about which he was not charged." Our review of the record shows no evidence of prosecutorial misconduct. In her closing argument, the prosecutor merely restated the elements of the offenses with which Woods was charged, outlined the evidence against Woods, and connected the evidence to each element of the offense. The prosecutor used no inflammatory language whatsoever and

referenced no unadmitted evidence.  Accordingly, Woods's claim of prosecutorial misconduct fails.[26]

## III.  CONCLUSION

After full record review and oral argument, we affirm Woods's convictions on all three counts.

**AFFIRMED.**

---

[26] Woods also claims that the district court erred (1) in refusing to give Woods's requested jury instructions; (2) in unduly limiting Woods's counsel's cross-examination of government witnesses concerning the circumstances of Woods's statements; and (3) in denying his mistrial motion that was based on a government witness's testimony about the victim of the child molestation depicted in a video found on Woods's computers.  All of these claims lack merit and do not warrant further discussion.