[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15235

_____

D.C. Docket No. 6:14-cr-00080-PGB-TBS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRIAN NEWTON,
VICTORIA SNOW,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(March 7, 2019)

Before JORDAN and JULIE CARNES, Circuit Judges, and SCHLESINGER,[*]
District Judge.

_____

[*] Honorable Harvey Schlesinger, United States District Judge for the Middle District of Florida,
sitting by designation.

JULIE CARNES, Circuit Judge:

Over a six-year period, Defendants Brian Newton and Victoria Snow conspired to defraud two companies, Amerifactors Financial Group, Inc. ("Amerifactors") and Prestige Funding Group LLC ("Prestige"), of millions of dollars. Following a jury trial, Newton and Snow were convicted of one count of conspiring to commit mail and wire fraud, in addition to several counts of substantive mail and wire fraud. The district court sentenced Newton and Snow to 188 months' imprisonment and 57 months' imprisonment, respectively. On appeal, Newton and Snow raise various challenges to their convictions and sentences. After careful review and with the benefit of oral argument, we affirm.

## BACKGROUND

I.    **Facts**

Newton and Snow were employed by Dataforce International ("Dataforce"): Newton was a managing partner and Snow was the office manager. Dataforce provided IT staffing and support services to Fortune 1000 companies, including a substantial amount of consulting services to Hewlett-Packard. To receive payment from Hewlett-Packard, Dataforce submitted invoices for completed work. Initially, Hewlett-Packard processed paper invoices manually but Hewlett-Packard converted to an online-invoicing system in 2004.

2

After Newton joined Dataforce, Newton and Dataforce's President Gary Baran selected Amerifactors to serve as Dataforce's primary factoring company. In purchasing accounts-receivable invoices from other companies, a factoring company pays less than the face value of those accounts, but makes its profit by collecting the full amount due on the invoices from the party owing the money. As part of the agreement, Dataforce agreed to have Amerifactors factor invoices for work completed for Hewlett-Packard. Amerifactors typically purchased each invoice for 90% of the face value and, in turn, Amerifactors expected Hewlett-Packard to pay the full amount of the invoice.

In the meantime, Newton co-founded with Joe Santoro another company, called Prestige, for the purported purpose of factoring invoices. He successfully solicited investments of more than $8 million from numerous investors for this company. Newton told investors that the company would be factoring invoices for Hewlett-Packard. Unbeknownst to Prestige investors and Santoro, however, Newton sold invoices to Prestige that had already been sold to Amerifactors. Obviously, as to those double-sold invoices, one of the two factoring companies would be unable to collect any money.

In addition to selling the same invoices to both companies, Newton and Snow also sold to Amerifactors and Prestige purported Hewlett-Packard invoices for work that, in fact, had never been done. To avoid having Hewlett-Packard raise

3

a fuss about invoices for non-existent work, Newton and Snow never submitted those invoices to Hewlett-Packard for payment.  Further, Newton allayed any suspicion on the part of Prestige investors by making quarterly payments to them to create an impression that their investments were generating interest.

To prevent Baran (Dataforce's President) from discovering that both Amerifactors and Prestige were factoring the same invoices, Newton also set up a company called B&B Investments to act as an intermediary between Dataforce and Prestige.  Newton then directed Santoro (his partner at Prestige) to deposit payments for the invoices it purchased from Dataforce into B&B Investments.

An Amerifactors employee, Bonni Jacobi, eventually discovered the fraud when she began investigating several past-due Hewlett-Packard invoices. Amerifactors had been submitting invoices to Hewlett-Packard at a specific address provided by Newton.  When Jacobi learned that the address Newton provided was the home address of a Hewlett-Packard employee and further that Hewlett-Packard no longer even accepted mailed invoices, having converted to an online-invoicing system, Jacobi realized that something was greatly amiss.  Her discovery led to the unraveling of Newton and Snow's scheme.

## II.    Procedural History

A federal grand jury issued an indictment charging Newton and Snow with: (1) conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349

4

(Count 1); (2) mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2 through 14); and (3) wire fraud, in violation of 18 U.S.C. § 1343 (Counts 15 through 25).  Both Defendants pled not guilty and proceeded to trial.

During the 13-day trial, the Government presented testimony from numerous witnesses.  At the close of the Government's case-in-chief, Newton and Snow moved for judgment of acquittal.  The district court denied their motions.  Both Newton and Snow renewed their motions at the close of all the evidence, which were again denied by the court.  After the jury found Newton and Snow guilty of all charges, the district court sentenced Newton to 188 months' imprisonment and Snow to 57 months' imprisonment.  This appeal followed.

## DISCUSSION

### I.    Challenges to the Conviction

#### A.    Omission of "Willfulness" as an Element in Jury Instructions Concerning the Substantive Offenses of Mail and Wire Fraud

Defendant Snow[1] asks that her convictions for mail and wire fraud be vacated because the district court did not instruct the jury that, to convict on these counts, it would have to find that the defendants acted "willfully."  We first note that the relevant statutes do not include willfulness as an element.  The statute

---

[1]  In his brief, Newton states that he "adopts by reference all substantive arguments" contained in Snow's brief.  We consider this particular argument and Snow's "redaction" argument to be adopted.

5

proscribing mail fraud provides that "[w]hoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," performs certain acts involving the use of the mails is guilty of a crime. *See* 18 U.S.C. § 1341. The statute prohibiting wire fraud uses the same language quoted above to make criminal those same acts undertaken through the use of "wire" communications in interstate commerce. *See* 18 U.S.C. § 1343. Although one might reason that a person who has devised a scheme to defraud or to obtain property by means of false and fraudulent representations will usually have also acted willfully,[2] the statutes at issue here do not include willfulness as an element.

Indeed, at trial, Snow never asked the district court to include a willfulness element in its instructions concerning mail and wire fraud. To the contrary, she and her co-defendant Newton, along with the Government, asked the district court to use the Eleventh Circuit Pattern Jury Instructions for the substantive charges of mail and wire fraud. The pattern instructions for the substantive offenses of mail

_____

[2] The Pattern Jury Instructions contrast merely doing something "knowingly" with doing something "willfully." The instructions provide: "The word 'knowingly' means that an act was done voluntarily and intentionally and not because of a mistake or by accident." The word 'willfully' means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids before you can find that the person acted 'willfully,' the person need not be aware of the specific law or rule that [his] [her] conduct may be violating." Eleventh Circuit Pattern Instructions (Criminal) Basic Inst. 9.1A (2010 ed.).

6

and wire fraud track the statutory language and do not require the jury to find that the defendant acted willfully.  The district court acceded to Defendants' request to use these two pattern instructions, and the particular instruction it read to the jury was nearly identical to those pattern charges.  *See* Eleventh Circuit Pattern Instructions (Criminal) Offense Inst. 50.1, 51 (2010 ed.).

Yet even though the district court gave the instruction that Snow requested, she now argues that the court should have deviated from that request and instructed the jury that willfulness was an element of the offenses.  Any success based on this tardy change of mind, however, is precluded by the invited-error doctrine.  "It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party."  *United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997) (quotations omitted).  *See United States v. Silvestri*, 409 F.3d 1311, 1327–28 (11th Cir. 2005) (concluding that the invited-error doctrine precludes a challenge on appeal by a defendant who accepted at trial the language of the jury instruction in question).  Accordingly, even if we assumed that the district court could have properly added the element of willfulness into its instructions on these substantive offenses, Snow cannot succeed in her efforts to

7

reverse the mail and wire fraud convictions because she got the very instruction that she had requested the district court to give.[3]

## B.    Sufficiency of the Evidence

Contending that there was insufficient evidence to support her convictions, Snow argues that the Government failed to establish that she intended to defraud Amerifactors and Prestige investors or that she willfully joined the conspiracy.[4]

We review a sufficiency-of-the-evidence challenge *de novo*. *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). When reviewing for sufficiency of the evidence, we view the evidence in the light most favorable to the Government, with all inferences and credibility choices made in the Government's favor, and we

---

[3] For what it's worth, we note that, as also requested by the parties, the district court gave the pattern instruction for the conspiracy charge, which pattern instruction indicated that willfulness is required to convict a defendant of conspiracy to commit mail and wire fraud. "It is a federal crime to knowingly and willfully conspire or agree with someone to do something that, if actually carried out, would result in the crime of mail fraud or wire fraud." "The defendants can be found guilty of this conspiracy offense only if all of the following facts are proved beyond a reasonable doubt: . . . .2. The defendant knew the unlawful purpose of the plan and willfully jointed in it . . . ." *See* Eleventh Circuit Pattern Instructions (Criminal) Offense Inst. 54 (2010 ed.). Both defendants here were convicted of the conspiracy count as well. Thus, the jury knew that Defendants had to have willfully conspired to be convicted of that count, and the jury concluded that they had acted willfully.

[4] Newton has not argued that the evidence was insufficient to support his conviction. Nor can he adopt Snow's insufficiency-of-the evidence argument, given the fact-intensive nature of such an argument. *See United States v. Khoury*, 901 F.2d 948, 963 n.13 (11th Cir. 1990) (explaining that a sufficiency-of-the-evidence argument requires independent briefing due to the fact-specific nature of the argument).

8

affirm the conviction if, based on this evidence, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

To sustain a conviction for mail and wire fraud, the Government must establish: "(1) intentional participation in a scheme to defraud, and, (2) the use of the interstate mail or wires in furtherance of that scheme." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). Intent to defraud can be established when "the defendant believed that he could deceive the person to whom he made the material misrepresentation out of money or property of some value." *United States v. Wetherald*, 636 F.3d 1315, 1324 (11th Cir. 2011) (quotations omitted) ("A jury may infer an intent to defraud from the defendant's conduct.").

Based on the evidence presented at trial, a reasonable jury could find beyond a reasonable doubt that Snow was guilty of conspiracy, as well as the substantive offenses of mail and wire fraud. The evidence revealed that, as Dataforce's office manager, Snow was responsible for the day-to-day operations of Dataforce, including the assembly and approval of invoices that were sold to Amerifactors, as well as the submission of invoices to Hewlett-Packard for payment. Moreover, Snow directed a Dataforce employee (1) to sell invoices to Amerifactors but not submit those invoices to Hewlett-Packard for payment, (2) to create invoices to sell to Amerifactors for work that had not been completed, and (3) to sell invoices to

9

Prestige that had already been sold to Amerifactors. Snow also personally profited from the scheme. *See United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011) (indicating that a jury can infer intent to defraud in part from a defendant personally profiting from the scheme). Viewing this evidence in the light most favorable to the Government, a reasonable jury could infer that Snow intended to defraud, and that she acted to effectuate that intent.

A reasonable jury could also conclude that Snow willfully joined the conspiracy. *See Maxwell*, 579 F.3d 1282 (explaining that to sustain a conviction for conspiracy to commit mail and wire fraud, the Government must prove that the defendant "knew of and willfully joined in the unlawful scheme to defraud"). Again, Snow directed a Dataforce employee to submit invoices to Prestige that had already been sold to Amerifactors. Snow was also the main point of contact at Dataforce for Amerifactors and Hewlett-Packard. Finally, she took affirmative steps to cover up the scheme by not submitting the invoices to Hewlett-Packard's online-invoicing system and by encouraging an employee at Amerifactors not to contact Hewlett-Packard about past due invoices.

In short, because we conclude that a reasonable jury could have found beyond a reasonable doubt that Snow was guilty of conspiracy and the substantive offenses of mail and wire fraud, we necessarily conclude that there was sufficient evidence to support Snow's convictions.

10

### C.    Redaction Error

Snow argues that she was unfairly prejudiced by the district court's admission into evidence of a tax return containing Newton's wife's name.  Prior to trial, the district court had granted Newton's and Snow's motions *in limine* to exclude evidence related to their extramarital affair and Newton's marital status.  Newton's counsel made the necessary redactions but inadvertently failed to redact one document:  a 2003 tax return that showed the name of Newton's wife.

Because Snow did not object at trial to the admission of the unredacted tax return before the district court, we review for plain error.  *See Wetherald*, 636 F.3d at 1320 (explaining that an error raised for the first time on appeal is reviewed for plain error).  Nevertheless, even if we assume that the admission of the tax return constituted error and that the error was plain, Snow cannot meet the third prong of the plain-error test, which requires a showing that the error affected her substantial rights.  *See Turner*, 474 F.3d at 1276.  To meet that test, Snow must show that the error "affected the outcome of the district court proceedings."  *United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005) (quotation omitted).

Snow has failed to meet this burden.  The Government introduced hundreds of exhibits admitted at trial, and this tax return, from all the way back in 2003, was hardly a key component of the Government's case.  The tax return merely noted the name of Newton's wife in 2003.  *See id.*  Given the overwhelming evidence of

11

Snow's guilt presented at trial, the failure to redact Newton's wife's name from the 2003 tax return does not leave "grave doubt" that it affected the outcome of the case. *See Turner*, 474 F.3d at 1276 ("Errors do affect a substantial right of a party if they have a 'substantial influence' on the outcome of the case or leave 'grave doubt' as to whether they affected the outcome of the case." (quotations omitted)).

### D.    Constructive Amendment

Newton argues that the district court's admission of evidence and instructions to the jury constructively amended the indictment and permitted him to be convicted of a crime for which he was not indicted.  Specifically, Newton challenges (1) the district court's admission of evidence showing that he misrepresented to Prestige investors that their investments were backed by Hewlett-Packard and (2) the court's instruction to the jury that it could convict based on a finding that Newton engaged in a scheme to defraud involving the use of false or fraudulent representations.  Because Newton did not raise the issue of constructive amendment before the district court, we review only for plain error. *See Wetherald*, 636 F.3d at 1320.

As to this allegation, Newton has failed to show that any error occurred, plain or otherwise.  "A constructive amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *United*

12

*States v. Madden*, 733 F.3d 1314, 1318 (11th Cir. 2013).  Here, the indictment alleged that Newton and Snow conspired to commit mail and wire fraud by, "with intent to defraud, devising, and intending to devise, a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises that related to material facts."

The evidence showing that Newton told Prestige investors that their investments were guaranteed by Hewlett-Packard provided support for establishing the means by which Newton furthered the conspiracy to commit mail and wire fraud.  Indeed, the evidence was relevant to establishing Newton's intent to defraud because he convinced Prestige investors to invest by misrepresenting that their investments would be backed by Hewlett-Packard.  As one Prestige investor testified at trial, he believed he was making a safe investment based on Newton's representation that Dataforce had a master-vendor agreement with Hewlett-Packard.

For the same reason, Newton's misrepresentation also played a part in the substantive mail fraud offenses.  Indeed, Newton's act of mailing interest checks to investors helped maintain the appearance that their investments in Prestige were safe.  *See United States v. Lehder-Rivas*, 955 F.2d 1510, 1519 n.5 (11th Cir. 1992) (explaining that the admission of evidence intrinsic to proving the indicted crimes does not impermissibly broaden the indictment).

13

As for Newton's argument that the district court's instruction to the jury constructively amended the indictment, he invited any error by requesting the instructions the district court provided to the jury.  See discussion *supra* at I.A.  In short, Newton has not shown error, much less plain error.

## II.    Newton's Challenges to His Sentence[5]

### A.    Loss Calculation

Newton argues that the district court's calculation of the loss to be attributed to him is clearly erroneous because it was not supported by specific and reliable evidence.  We review the district court's interpretation of the Guidelines *de novo*. *United States v. Barrington*, 648 F.3d 1178, 1198 (11th Cir. 2011).  We review the district court's loss calculation for clear error.  *United States v. Hernandez*, 160 F.3d 661, 667–68 (11th Cir. 1998).  "Although review for clear error is deferential, a finding of fact must be supported by substantial evidence."  *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007).

Newton's Presentence Investigation Report ("PSR") was prepared in October 2015, using the then-applicable 2014 Sentencing Guidelines.  Under that

---

[5]  Snow purports to adopt "the relevant issues and arguments, applicable to her appeal" contained in Newton's brief.  She, however, has raised no sentencing issues in her appeal brief.  Similarly, she never challenged her sentence at oral argument, either in her initial argument or her rebuttal. At any rate, at best, Snow would be entitled to only plain error review, and she has made no effort to indicate how any sentencing errors by the district court would have changed the outcome of her proceedings.

version of the Guidelines, Newton received a 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K) because the loss was more than $7,000,000 but less than $20,000,000. By the time of the sentencing hearing on November 5, 2015, the 2015 amendments to the Guidelines had taken effect, that event having occurred on November 1. Both the district court and the parties agreed that the Guideline governing loss amounts had been amended and that it was the 2015 calculation that should control. The court noted that prior to November 1, § 2B1.1(b)(1) had provided for a 20-level enhancement if the loss exceeded $7,000,000, but that the 2015 Guidelines provided for only an 18-level enhancement if the loss exceeded $3,500,000 million but was less than $9,500,000 million. The district court found that the loss was between $3.5 million dollars and $9,500,000, and it imposed an 18-level enhancement.

Newton objected to this loss calculation, arguing that the loss did not exceed the $3.5 million threshold for imposition of an 18-level enhancement. In response to Newton's objection to the loss-amount calculation, the Government presented two summary charts setting out the total loss sustained by Amerifactors and Prestige investors. The first exhibit indicated that the total amount of loss to Prestige investors was $4,748,373.94, which reflected the difference between the total amount each investor had invested in Prestige and the amount each investor had received in quarterly interest payments.

15

The second exhibit indicated that the total amount of loss to Amerifactors was $2,468,218.86. The Government explained that it had calculated this amount by adding the value of every invoice purchased by Amerifactors that had not been bought back by Dataforce.[6] The Government then reduced that number to reflect the amount Amerifactors had actually paid on each invoice, which in most cases was only 90% of the total invoice amount.[7]

The Guidelines' commentary defines "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense" and "intended loss" is the "pecuniary harm that the defendant purposefully sought to inflict . . . [and] that would have been impossible or unlikely to occur." *Id.* § 2B1.1, comment. (n.3(A)(i)-(ii)). The district court concluded that based on the evidence presented at trial, it was reasonably foreseeable that the loss to Prestige investors and Amerifactors was $4,748,373.94 and $2,468,218.86, respectively, or approximately $7 million. Accordingly, the district court determined that Newton was subject to an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J), which called for that enhancement if the loss attributable to the defendant is more than $3,500,000 but less than $9,500,000. U.S.S.G. § 2B1.1(b)(1)(J) (2015).

---

[6] Dataforce occasionally bought back invoices from Amerifactors when Hewlett-Packard did not pay Amerifactors on those invoices within a certain period of time.

[7] The number was further reduced by $50,000 to reflect the amount Amerifactors received from Hewlett-Packard in separate civil litigation.

16

In reviewing Newton's challenge to the loss calculation, we note that the Government must establish the facts by a preponderance of the evidence and support the loss calculation with reliable and specific evidence. *Bradley*, 644 F.3d at 1290. The district court is only required to make a reasonable estimate of the loss, and we owe appropriate deference to that determination. U.S.S.G. § 2B1.1, comment. (n.3(C)). When making the loss determination, the district court is permitted to use evidence from the trial, undisputed PSR facts, and evidence from the sentencing hearing. *Bradley*, 644 F.3d at 1290.

Here, in calculating the loss amount, the district court relied on the evidence presented at trial and found to be accurate the summary charts presented by the Government at the sentencing hearing. On appeal, Newton asserts that the Government failed to establish the loss amount with specific and reliable evidence because the summary charts were not authenticated by any witness testimony. Yet, at sentencing, Newton never complained about the absence of authentication. Had he done so, the Government would have been able to remedy any authentication concerns. Instead, he objected only to the loss amount represented in those summary charts. It is that objection on which we focus.

We conclude that the district court's calculation of loss attributable to Newton was not clearly erroneous. To the contrary, the district court was meticulous and thorough in its assessment, having taken over 90 pages of notes

17

during trial and displaying at the sentencing hearing a detailed knowledge of the evidence and its relation to the calculation of loss. The loss calculation was supported by specific and reliable evidence, as the summary charts presented by the Government were based on Special Agent Andrew Culbertson's testimony at trial regarding the flow of money and the amount of money lost by Amerifactors and Prestige investors. *Bradley*, 644 F.3d at 1290. Indeed, the evidence presented at trial showed that Prestige investors invested approximately $8,500,000 and received $3,500,000 back in interest payments, resulting in a net loss of approximately $5,000,000. As to Amerifactors, Special Agent Culbertson testified at trial that Amerifactors purchased $2,978,617 worth of invoices from Dataforce that were never submitted to Hewlett-Packard for payment. Moreover, Amerifactors's President Kevin Gowen testified at trial that Amerifactors sustained a loss of $2,757,965.

We acknowledge that the loss amounts presented at sentencing— $4,748,373.94 to Prestige investors and $2,468,218.86 to Amerifactors—were less than the amounts testified to at trial.[8] But that benefitted Newton. Moreover, the

---

[8] The amount attributed to Amerifactors at sentencing took into account the invoices that had been bought back by Dataforce, the percentage at which Amerifactors typically purchased the invoices from Dataforce, and the amount that Amerifactors had received from Hewlett-Packard as part of separate civil litigation. *See Bradley*, 644 F.3d at 1292 (explaining that although some of the evidence relied on by the district court in calculating the loss amount was not introduced at trial, there was nothing to suggest that the information was not reliable).

district court is only required to make a reasonable estimate of the loss. *See* U.S.S.G. § 2B1.1, comment. (n.3(C)). Because the district court's loss calculation was a reasonable estimate based on the evidence presented at trial, the district court did not clearly err by concluding that the total loss was between $3.5 and $9.5 million. *Cf. United States v. Pierre*, 825 F.3d 1183, 1197–98 (11th Cir. 2016) (concluding that the district court did not clearly err in its loss determination because it was supported by the record); *see also United States v. Manoocher Nosrati-Shamloo*, 255 F.3d 1290, 1292 (11th Cir. 2001) (concluding that the district court did not clearly err in determining the loss amount in part because the defendant did not present any evidence to rebut the evidence presented by the Government at the sentencing hearing). Accordingly, the district court's application of an 18-level enhancement under § 2B1.1(b)(1)(J) was proper.

**B.  Enhancement of Newton's Sentence Based on The Number of Victims, per U.S.S.G. § 2B1.1(b)(2)**

1.  The "One Book Rule"

In calculating Newton's adjusted offense level, the district court started with the appropriate 7-level base offense level (§ 2B1.1(a)(1) and enhanced that level by 18 levels, based on the loss amount discussed above (§ 2B1.1(b)(1)(J)); by 4 levels, based on the number of victims involved in the scheme (§ 2B1.1(b)(2)); by 2 levels, based on the offense's use of sophisticated means (§ 2B1.1(b)(10); by 3 levels, based on Newton's aggravated role in the offense (§ 3B1.1(b)); and by 2

19

levels, based on Newton's obstruction of justice (§ 3C1.1), for a final adjusted offense level of 36. Combined with a criminal history score of I, this calculation yielded a sentencing range of 188–233 months. The district court declined Newton's request for a variance and imposed a sentence of 188 months.

Of pertinence to the present discussion is the enhancement based on the number of victims. As noted earlier, the loss enhancement originally called for by the 2014 Guidelines would have been a level 20, but by the time of sentencing, the 2015 Guidelines were in effect and the latter had amended the loss guideline to create a higher threshold for the imposition of loss. Thus, based on the 2015 Guidelines, the amount of loss attributable to Newton yielded only an 18-level enhancement. The court, the Government, and Newton agreed that he was entitled to be sentenced under the 2015 Guidelines, and therefore he received this 18-level enhancement for loss, as opposed to the 20-level enhancement called for by the 2014 Guidelines.

As we now know, Section 2B1.1(b)(2), which governs an enhancement based on the number of victims, had likewise been amended by the 2015 Guidelines. As will be discussed in more detail, when compared with its 2014 counterpart, the 2015 version had the potential to reduce the applicable enhancement for this provision in some circumstances, but it also had the potential to increase the enhancement in other circumstances. Although the district court

20

had been alerted to the fact the guideline governing the loss enhancement had been amended, apparently no one saw fit to inform the court that the provisions concerning the number-of-victims enhancement had also changed.  Presumably, this would have been the duty of the probation officer, whose job it is to keep up with things like Guidelines' amendments and to recommend to the sentencing judge the applicable guidelines' analysis, but one would also have expected defense counsel and Government counsel, aware already of one amendment to the Guidelines, to have been vigilant about the possibility that another provision might also have changed.

At any rate, whether inadvertent or not, no one advised the district court that the number-of-victims enhancement[9] had been amended by the 2015 manual.[10] What this means, in effect, is that the district court used the 2015 manual for purposes of determining loss, but (unknowingly) used the 2014 manual for purposes of determining the imposition of the number-of-victims enhancement. Newton asserts that the district court should have applied the 2015 Manual's enhancement provision based on the number of victims.

---

[9]  Likewise, as will be discussed, the provision concerning the sophisticated means enhancement had also been amended in the 2015 manual.

[10]  We use the word "manual" interchangeably with the phrase "version of the Guidelines."

21

It is true that only one version of the Guidelines should be used in calculating a defendant's offense level.  That principle has become known as the "one-book rule."  Here's how it works.  As a general matter, a convicted defendant's sentence is based on use of the Guidelines Manual in effect on the date the defendant is sentenced.  *United States v. Bailey*, 123 F.3d 1381, 1403 (11th Cir. 1997) (citing 18 U.S.C. § 3553(a)(4); U.S.S.G. § 1B1.11(a)).  That general rule, however, gives way to an exception if use of the Guidelines Manual in effect at the time of sentencing would result in a harsher sentence (translated:  higher Guidelines' offense level/range) than would have arisen from use of an earlier manual in effect at the time of the commission of the crime for which the defendant is being sentenced.  The reasoning is that imposition of a harsher sentence arising out of sentencing provision enacted after the commission of a defendant's crime would violate the Ex Post Facto Clause, and when that prospect arises, the district court must use the Guidelines Manual that was in effect on the date the crime was committed.  *Bailey*, *id.*

Sensitivity to the Ex Post Facto Clause, however, does not mean that a sentencing court can properly hunt and peck its way through multiple manuals in effect during the time period in which the defendant's crimes were committed, applying the most favorable combination of Guidelines' provisions to arrive at the most lenient sentence for a defendant.  Instead, the sentencing court must use

22

"either the Sentencing Guidelines Manual in effect at sentencing or the one in effect when the crime was committed," which "is known as the "one book rule." *Id.  See also* U.S.S.G. § 1B1.11(b)(2)[11] (codifying the one-book rule).  The notion behind the one-book rule is that "the application of different versions of the Sentencing Guidelines Manual would contravene the sentencing uniformity objective of the Sentencing Commission, which intended that the Guidelines be applied 'as a cohesive whole' and not 'in a piecemeal fashion' so that a defendant cannot 'mix and match amended provisions' to achieve a more favorable sentence." *Bailey*, 123 F.3d at 1404.

2.    Application of the Number-of-Victims Enhancement in this Case

As noted above, Newton's PSR, which was completed in October 2015, applied the 2014 version of the Guidelines.  The PSR recommended, among other things, a 4-level enhancement under § 2B1.1(b)(2)(B), which enhancement was applicable if the offense involved 50 or more victims.[12]  At the sentencing hearing on November 5, 2015, Newton argued that there were fewer than 50 victims.  The district court concluded otherwise and applied the 4-level enhancement.

---

[11]  A court that uses an earlier edition of the Guidelines can apply later amendments to the extent such amendments are clarifying, rather than substantive.  *See* U.S.S.G. § 1B1.11(b)(2).

[12]  In pertinent part, the 2014 Manual provided for a 2-level enhancement if the offense involved 10 or more victims; for a 4-level enhancement if the offense involved 50 or more victims; and a 6-level increase for 250 or more victims.

Unbeknownst to the court, the 2015 Manual, however, changed the threshold and the requirements for two of the enhancement levels under this provision. Unchanged was the 2-level enhancement. As with the 2014 Manual, under the 2015 Manual a defendant receives a 2-level enhancement when the offense involved 10 or more victims. The 2015 manual, however, did make significant changes to the 4- and 6-level enhancements. As to the 4-level enhancement, while the 2014 Manual required the existence of at least 50 victims, the 2015 Manual only requires that there be at least 5 victims, but the offense must have resulted in "substantial financial hardship" to those victims. As to the 6-level enhancement, although the 2014 Manual required the existence of at least 250 victims, the 2015 Manual only requires the existence of at least 25 victims, but again it requires that those 25 victims have suffered substantial financial harm as a result of the offense. *Compare* U.S.S.G. § 2B1.1(b)(2)(B) (2014) *with* U.S.S.G. § 2B1.1(b)(2)(B) (2015).

As noted, under the one-book rule, the district court should have applied the 2015 Manual as to all enhancements, including the number-of-victims enhancement. Instead, as to the latter, it used the iteration found in the 2014 Manual. Newton, however, never objected to the court's use of the 2014 Manual's iteration of this enhancement. Because Newton challenges the district court's use

24

of the wrong version of the Guidelines for the first time on appeal, we review only for plain error.[13]  *See Wetherald*, 636 F.3d at 1320.

To establish plain error, a defendant must show that there was "(1) error, (2) that is plain and (3) that affects substantial rights.  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007).

We conclude that the district court committed error, that was plain, by applying the 2014 version of the Guidelines with respect to the number-of-victims enhancement instead of the 2015 Manual.  As noted, the sentencing court is required to apply the version of the Guidelines in effect at the time of the sentencing, which here was the 2015 version.  *See Bailey*, 123 F.3d at 1403–05; *United States v. Wilson*, 993 F.2d 214, 216 (11th Cir. 1993).  The problem for Newton, however, is the third prong of the plain-error test, which requires the defendant to show that the error affected substantial rights.  For an error to affect

---

[13]  We reject the Government's contention that our review of this argument is precluded by the invited-error doctrine.  Newton did not request that the district court apply the 2014 version of the Guidelines, which provided for a 4-level enhancement if the offense involved 50 or more victims.  *See* U.S.S.G. § 2B1.1(b)(2)(B) (2014).  Instead, Newton simply failed to object when the district court (and parties) assumed that the 2014 version applied.  We therefore review for plain error.  *See United States v. Dortch*, 696 F.3d 1104, 1112 (11th Cir. 2012) (stating that "failing to object does not trigger the doctrine of invited error").

substantial rights, "in most cases it means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. De La Garza*, 516 F.3d 1266, 1269 (11th Cir. 2008) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). And as a complaining party who failed to object to the error before the district court, the defendant has the burden of persuasion as to prejudice. *United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005).

Here, we conclude that Newton has failed to show prejudice because he has failed to show that the outcome of the proceedings—that is, his sentencing range under the Guidelines—would have been any different had the district court applied the 2015 Guidelines as to the number-of-victims enhancement. To explain why, we contrast this case with *Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016). In *Molina-Martinez*, there was no doubt that the sentencing court had applied the wrong sentencing range because there was no doubt that it had incorrectly added up the number of criminal history points that should have been assessed against the defendant. That is, the court had counted up 18 points, when it was clear that the defendant had earned only 11 points. With 11 points, instead of 18, the defendant was in criminal history category V, instead of VI, and he would therefore have been subject to a lower sentencing range. *Id.* at 1343, 1344.

26

Notably, there was no uncertainty about the fact that the court's error meant that it had miscalculated the Guidelines range and that the defendant should have been subject to a lower sentencing range. Specifically, with the Category VI criminal history applied by the sentencing court, the defendant was subject to a 77–96 month range; with the appropriate Category V, however, he was subject to only a 70–87 month range. Clearly, the district court had committed an error that was plain. But as the defendant had received a 77-month sentence, which was within the overlapping guidelines' range of both calculations, the question before the Supreme Court was whether the defendant had shown prejudice.

The Supreme Court concluded that the defendant had been prejudiced. The Court noted that, notwithstanding the Guidelines' advisory status, empirical sources indicate that the Guidelines are "not only the starting point for most federal sentencing proceedings but also the lodestar." *Id.* at 1346. Further, "when a Guidelines range moves up or down, offenders' sentences tend to move with it." *Id.* (citation omitted). Although not characterized expressly as a presumption, the Court observed that "[i]n most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." *Id*.

In *Molina-Martinez*, however, it was plain—that is, clear and obvious—that the sentencing court had used the wrong Guidelines range. It had incorrectly

27

counted the number of criminal convictions for purposes of assigning a criminal history category number, and that error was apparent from a review of the presentence report. Thus, the predicate for the Court's holding—and its observation concerning the implications of that holding—is the use by the district court of a Guidelines range that is wrong and whose inaccuracy is clear, obvious, and subject to no debate.[14]

Thus, to take advantage of the assumption/presumption of *Molina-Martinez* that a defendant who shows that he was sentenced pursuant to an incorrect sentencing range is a defendant who has shown a probability that, absent the error, the outcome of the proceeding would have been different, Newton needs to first show that he would have been subject to a lower sentencing range had the 2015 Manual been used. Moreover, the traditional principle requiring an appellant who asserts plain error to show prejudice—that is, that the outcome of the proceedings would have been different—applies here. *See, e.g., United States v. Margarita Garcia*, 906 F.3d 1255, 1267 (11th Cir. 2018); *United States v. Rodriguez*, 627

---

[14] Indeed, that is the same scenario that the Supreme Court confronted in *Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018)**,** when it expanded the reasoning of *Molina-Martinez* to conclude that the use by a sentencing court of a plainly wrong sentencing range also satisfies the "fourth' prong of the plain error test: that the error seriously affects the fairness, integrity, or public reputation of the proceedings. In *Rosales-Mireles*, the sentencing court had made a simple arithmetic mistake when it counted twice a prior conviction and when that miscounting had jumped the defendant from a Category V to a Category VI. This arithmetic mistake, and its impact on the calculation of the Guidelines' range, was clear and obvious. That is, there could be no debate that the corresponding sentencing range triggered by this mistaken calculation was incorrect.

F.3d 1372, 1380 (11th Cir. 2010); *United States v. Gonzalez*, 550 F.3d 1319, 1323 (11th Cir. 2008).

In this case, however, it is not at all clear that a lower sentencing range would have resulted from the use of the 2015 Manual's provision concerning the number-of-victims enhancement. Indeed, it is even possible that Newton might have been subject to a higher range had the 2015 Manual been used. Specifically, as set out above, over Newton's objection and per the PSR's recommendation, the district court applied a 4-level enhancement based on § 2B1.1(b)(2)(B), which under the 2014 Manual imposed that enhancement if the offense involved 50 or more victims. At the sentencing hearing, Newton argued that there were only 48 victims, while the Government argued that there were 66, and provided a chart in support of that assertion. The court found for the Government on this point and, concluding that there were more than 50 victims, he imposed the 4-level enhancement.

As noted above, the requirement for receiving a 2-level enhancement based on § 2B1.1(b)(2) is the same under both the 2014 and the 2015 Manual: an offense involving 10 or more victims. Clearly, Newton would be subject to a 2-level enhancement under both versions. The 2015 Manual did change the requirements for imposition of a 4-level enhancement. While the 2014 Manual required the existence of at least 50 victims, the 2015 Manual only requires that there be at least

29

5 victims.  It does, however, also require that the offense have resulted in "substantial financial hardship" to those victims.  In explaining what the Guidelines mean by "substantial financial hardship," the relevant commentary indicates that when determining whether a victim suffered substantial hardship, the court shall consider in relevant part whether the victim (1) became insolvent, (2) filed for bankruptcy, (3) suffered retirement losses, (4) changed his or her employment, (5) changed his or her living arrangements, or (6) had difficulty obtaining credit.  U.S.S.G. § 2B1.1(b)(2), comment. (n.4(F)).

As the party bearing the burden of persuading us that he would have been subject to a different Guidelines range had the district court applied the 2015 iteration of § 2B1.1(b)(2), Newton has offered nothing in support of an argument that there were not at least 5 victims who might have suffered substantial financial hardship, as that term is defined under the Guidelines.[15]  Indeed, in his brief, Newton has not even attempted to explain why he would not still qualify for a four-level enhancement under the 2015 version of the Guidelines.

Further, the Government has noted that, of the 66 victims, 15 lost more than $100,000, with six of the victims losing between $205,438 and $893,397; 34 victims lost more than $25,000.  Certainly, it is possible that none of those

---

[15]  His entire argument on this issue is only a paragraph in length.

victims—or more precisely, less than 5 of those victims—suffered a substantial financial hardship as a result of being duped by Newton. But possible is not good enough. In a plain error context, where the person asserting an error has the burden to prove prejudice, not knowing whether the error had any negative effect is fatal to the proponent. "As we said in *Rodriguez*, where 'we don't know' what the district court would have done, and 'the record provides no reason to believe any result is more likely than the other,' the appellant cannot prevail." *Dell v. United States*, 710 F.3d 1267, 1277 (11th Cir. 2013) (citation omitted). *See also Gonzalez*, 550 F.3d at 1322 (in determining whether a Guidelines ruling by the district court constituted plain error, "Where error could have cut either way and uncertainty exists, the burden is the decisive factor in the third prong of the plain error test, and the burden is on the defendant." (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1300 (11th Cir. 2005)).

Moreover, it is possible that the 6-level enhancement under the 2015 Manual might have been in play had the 2015 Manual been used. As noted, although the 2014 Manual required the existence of at least 250 victims for this enhancement, the 2015 Manual only requires the existence of at least 25 victims, but again it requires that those 25 victims have suffered substantial financial harm as a result of the offense. With 33 of 66 victims suffering losses of over $25,000, there was at least a possibility that 25 of those victims suffered a substantial financial hardship.

31

This possibility that the 2015 enhancement governing number of victims might have produced a greater enhancement than that provided for by the 2014 Manual is another factor disfavoring a finding of prejudice and supporting the rationale behind the requirement of a contemporaneous objection.  Requiring a contemporaneous objection "fosters finality of judgment and deters 'sandbagging,'" saving an issue for appeal in hopes of having another shot at trial if the first one misses." *Rodriguez,* 627 F.3d at 1379 (citation omitted).  "The daunting hurdles erected under plain error review are imposed for powerful reasons.  Without them, a defendant would be free to sleep on his rights at trial, and ignore his duty in our adversarial system to help the district court police the trial process in order to ensure fair and accurate fact-finding." *Margarita Garcia*, 906 F.3d at 1268.

In summary, Newton has failed to shoulder his burden of proving a probability that he would have been subject to a lesser sentencing range had he objected to the district court's use of the 2014 iteration of the number-of-victims enhancement.  *Cf. Rodriguez*, 398 F.3d at 1301 ("[W]here the effect of an error on the result in the district court is uncertain or indeterminate—where we would have to speculate—the appellant has not met his burden of showing a reasonable probability that the result would have been different but for the error.").  Having failed to shoulder his burden, Newton cannot succeed in his request for reversal on this ground.

32

C.    **Sophisticated Means Enhancement**

Newton also argues that the district court clearly erred by imposing a two-level enhancement for sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

We review for clear error a district court's finding that sophisticated means were used. *Barrington*, 648 F.3d at 1199. The 2014 Sentencing Guidelines provided for a two-level enhancement if "the offense otherwise involved sophisticated means." U.S.S.G. § 2B1.1(b)(10) (2014). This provision was amended in 2015 to provide for a two-level increase in the defendant's offense level if the "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." (U.S.S.G. § 2B1.1(b)(10) (2015) (2015 amended material is underlined). The commentary defines "sophisticated means" as "especially complex, or especially intricate conduct" that pertains to executing or concealing the offense. *Id.* § 2B1.1, comment. (n.9(B))).

Newton's PSR, which used the 2014 Guidelines, recommended a two-level enhancement under § 2B1.1(b)(10)(C) because the offense involved sophisticated means. At the sentencing hearing, Newton argued that the fraud was not complex or sophisticated, as it merely involved the creation and presentation of fraudulent invoices to Amerifactors and Prestige. In finding that the offense involved

33

sophisticated means, the district court concluded that the scheme involved, among other things:  (1) the creation of an investment firm (Prestige) to purchase invoices that had already been sold to Amerifactors; (2) the solicitation of investors to invest in the firm; (3) interest payments made to investors; (4) the use of an intermediary company to go between Dataforce and Prestige; (5) interfacing between Dataforce, Amerifactors, and Hewlett-Packard to keep the parties separated from each other; and (6) the creation of false timesheets and invoices.

We conclude that the district court did not clearly err in concluding that this offense involved sophisticated means. *See United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010) (explaining that each of a defendant's actions need not be sophisticated in order to warrant the enhancement, as it is sufficient that the totality of the scheme is sophisticated).

As to the newly-added language in the 2015 amendments requiring that the defendant intentionally engaged in or caused the conduct constituting sophisticated means, neither Newton nor the Government mentioned the existence of that new requirement to the Court, hence it was never discussed.  That being so, and as with the enhancement for number of victims, this means that Newton must demonstrate that the court plainly erred in applying the sophisticated means enhancement.  Like the victim enhancement, we conclude that it was error for the district court not to apply the 2015 amendment concerning the sophisticated means enhancement.  But

34

to prevail on this claim, Newton must prove prejudice arising from the error and, once again, he has failed to prove that the result of the proceedings would have been any different had the district court acknowledged the additional requirement that Newton intentionally engaged n or caused the conduct constituting the sophisticated means.  Again, he offers nothing to support such an inference. Indeed, on this record, it seems clear that Newton intentionally engaged in the conduct giving rise to the enhancement.  Although the district court did not specifically state that Newton engaged in or caused the conduct constituting sophisticated means, its findings support that conclusion.  Newton helped create Prestige, he solicited Prestige investors by representing that their investments were guaranteed by Hewlett-Packard, and he kept the charade going by making interest payments to Prestige investors.  Because the record establishes that the fraud was both sophisticated and that Newton personally caused or engaged in conduct constituting sophisticated means, the district court did not err by applying the two-level enhancement pursuant to § 2B1.1(b)(10)(C).

Accordingly, we affirm the district court's enhancement of Newton's adjusted offense level based on the use of sophisticated means.

## III.    CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences imposed by the district court.

35

**AFFIRMED.**